Ned GRIFFITH, Appellant
and Cross–Appellee,

v.

Warren TAYLOR II, and Aglietti, Rodey &
Offret, A Successor Partnership to
Aglietti, Pennington & Rodey, A Part-
nership, Appellees and Cross-Appellants.

No. S–6011, S–6021.

Supreme Court of Alaska.

April 18, 1997.

Andrew K. Kurzmann, Anchorage, for Appellant and Cross–Appellee.

Robert J. Dickson, Atkinson, Conway & Gagnon, Anchorage, for Appellees and Cross–Appellants.

Before COMPTON, C.J., MATTHEWS, J., and RABINOWITZ, J. Pro Tem.

## OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION

This appeal requires us to review the superior court's grant of summary judgment on a claim for professional malpractice against a law firm and an individual member of the firm. Specifically, we examine the scope of the duty which a law firm owes its former clients, as well as the scope of the duty which the individual attorney owes in the factual context of this case. We reverse in part the superior court's grant of summary judgment.

## II. FACTS AND PROCEEDINGS

Joe Griffith owned a piece of real property located at 1543 Porchet Way in Fairbanks. Joe and his son, Ned Griffith, improved the property by building a multi-family dwelling. Ned invested a substantial amount of his own time and money in the project.

At some point, Ned became concerned about his investment because he believed that Joe's indebtedness to him had grown too large. Joe agreed to quitclaim the property to Ned to secure Ned's investment. It was further agreed that when the project was completed, they would sell the property and that out of the proceeds Ned would be reimbursed for any monies which he had invested in the project.

Joe wanted Larry Dworkin to prepare a quitclaim deed naming Ned as the grantee. However, Ned did not trust Dworkin and he questioned Dworkin's advice regarding the deed.[1] Ned therefore went to Aglietti, Pennington & Rodey[2] (the Firm) for assistance with this matter. In April 1984, Ned met with Jill Dean, an associate at the Firm. Dean prepared a quitclaim deed for the property, which Joe signed on April 26, 1984.

On April 27, 1984, Ned signed a document prepared by Dworkin, granting a power of attorney to Joe "to transact fully and completely any and all business and confir [sic] these powers upon my father and to execute any and all documents nesessary [sic] to consumate [sic] any transaction." The parties dispute the purpose of this document. Ned contends that the power was granted for the purpose of purchasing land in California.[3] Before his death, Joe asserted that it was granted so he could retransfer the Porchet Way property back to himself when Ned had been reimbursed.

In August 1985, Joe approached the Firm and spoke with Warren Taylor II. Taylor had joined the Firm sometime in the spring of 1985. Joe told Taylor that the property had been transferred to Ned as security, that Joe had paid Ned back, and that he wished to use the power of attorney to transfer the property from Ned back to himself. Taylor prepared a quitclaim deed, with the signature line reflecting that it was being signed by Joe through the power of attorney granted by Ned. The Firm then recorded the deed.

In March 1987, it was called to Joe's attention that the 1985 deed might be invalid because Joe had used the power of attorney to grant the property to himself. He therefore once again approached Taylor, and this time asked him to prepare a deed to be signed by Ned. Taylor, following the statutory form, drafted a deed for Joe on which to obtain Ned's signature.[4] It was later determined that Ned's signature had been forged. The Firm did not assist Joe in recording the deed. Joe subsequently died.

---

1. Ned testified at his deposition that he was concerned about whether the deed transferring the property from Joe to him had to be signed by both Joe and his wife Mary, or whether a single signature was legally sufficient under Alaska law.

2. Aglietti, Rodey & Offret, the co-defendant in superior court, is the successor partnership to Aglietti, Pennington & Rodey.

3. This was the finding of the court in *Griffith v. Griffith*, No. 4FA–89–775 Civil (Alaska Super., May 18, 1992).

4. According to Ned's brief, Taylor gave the deed to Joe. According to Taylor's deposition testimony, Joe came to the office and took the deed without Taylor's knowledge.

In 1988, Ned learned of the 1987 deed when he attempted to sell the property. Ned then brought an action in superior court against Mary Griffith and the Estate of Joe Griffith to quiet his title in the Porchet Way property. *Griffith v. Griffith,* No. 4FA89–775 Civil (Alaska Super., May 18, 1992). The jury found that the 1985 and 1987 deeds were invalid, and that therefore title to the property belonged to Ned. *Id.* at 4–5.

Ned subsequently commenced the present suit against the Firm and Taylor, alleging professional malpractice, breach of fiduciary duty, and breach of contract. The crux of Ned's complaint was that the Firm had engaged in a conflict of interest by participating both in the transfer of the property to Ned and in the 1985 and 1987 transfers which attempted to divest him of title to the property. Ned also asserted ·that the Firm had breached its fiduciary duty to him by failing to notify him of Joe's efforts to transfer title back from Ned to Joe. As a result, Ned claimed he incurred $140,000 in attorney's fees and costs to litigate the quiet title action and suffered a diminution in the value of the property because of changes in the real estate market during the period of the litigation.

Numerous pretrial motions were filed by both parties. Initially, Ned moved for partial summary judgment regarding the relevant factual and legal issues resolved in *Griffith v. Griffith.* Ned argued that the Firm should be collaterally estopped from relitigating the issues decided in *Griffith* even though the Firm was not a party to the prior litigation. The Firm then filed separate summary judgment motions first on the part of Taylor individually [5] and then on behalf of the Firm and Taylor collectively. Finally, Ned filed a cross-motion for summary judgment on the merits of his claims. The superior court granted the Firm's motion for summary judgment and dismissed all causes of action against both Taylor and the Firm. The superior court additionally stated that Ned's claim against Jill Dean had not been properly pleaded, and therefore was not properly before it. Ned now appeals.

## III. DISCUSSION

### A. The Superior Court's Grant of Summary Judgment In Favor of the Firm [6]

Ned claims that the Firm acted negligently when it prepared the 1985 and 1987 deeds for Joe despite a conflict of interest with Ned, its former client. According to Ned, he approached the Firm to obtain advice regarding the securing of the debt that Joe owed to him and the Firm assisted him in preparing a quitclaim deed for this purpose. Ned then argues that by subsequently representing Joe in his efforts to divest Ned of this property, the Firm violated its ethical obligations by engaging in a conflict of interest. According to Ned, the Firm had a duty to either contact him to confirm that Joe had paid back the money he owed Ned, or at least to decline representation of Joe.

A claim for professional malpractice against an attorney must satisfy the following four elements:

1) [T]he duty of the attorney to use such skill, prudence, and diligence as other attorneys commonly possess and exercise;
2) [A] breach of that duty;
3) [A] proximate causal connection between the negligent conduct and resulting injury;
4) [A]ctual loss or damage resulting from the breach.

*Doe v. Hughes, Thorsness, Gantz, Powell & Brundin,* 838 P.2d 804 (Alaska 1992); *Bel-*

---

5. This motion was filed pursuant to both Civil Rule 12(b)(6) and Civil Rule 56.

6. We review a grant of summary judgment using our independent judgment. "[T]he court must determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts. All reasonable inferences of fact from proffered materials must be drawn against the moving party and in favor of the nonmoving party." *Wright v. State,* 824 P.2d 718, 720 (Alaska 1992) (citation omitted). However, this court may affirm a grant of summary judgment on grounds different from those advanced by the trial court. *Native Village of Eyak v. GC Contractors,* 658 P.2d 756, 758 (Alaska 1983).

land v. O.K. Lumber Co., 797 P.2d 638, 640 (Alaska 1990).

The superior court ruled that the Firm owed Ned no duty, and granted summary judgment to the Firm on that basis. It reasoned that the conflict of interests rules with regard to former clients are directed exclusively at preserving the confidentiality of information disclosed in the course of the attorney's representation of the former client. Because Ned conceded that no confidential information was disclosed to Jill Dean, the superior court reasoned, no conflict of interest arose. We disagree, and reverse the superior court's grant of summary judgment in favor of the Firm.

1. *Attorneys owe more than a duty of confidentiality to former clients.*[7]

At the time of the Firm's preparation of the 1985 and 1987 deeds, the relevant standard for determining whether a conflict of interest existed between a present and former client was articulated in *Aleut Corp. v. McGarvey*, 573 P.2d 473 (Alaska 1978). In *Aleut*, we held that an attorney

> may not represent a third party against a former client where there exists a substantial possibility that knowledge gained by him in the earlier professional relationship can be used against the former client, or where the subject matter of his present undertaking has a substantial relationship to that of the prior representation.[8]

573 P.2d at 474–75. The substantial relationship test for determining disqualification of an attorney is a prophylactic rule which obviates the need for the former client to demonstrate that confidential information was actually disclosed in the course of the prior representation. "For the Court to probe further and sift the confidences in fact

revealed would require disclosure of the very matters intended to be protected by the rule [of confidentiality]." *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265, 269 (S.D.N.Y.1953).

In the instant case, Ned has conceded that "[i]t is not alleged in this case that Warren Taylor, II utilized confidential information acquired by Defendant Law Firm from Ned Griffith at the time he prepared the quitclaim deed on behalf of Joe Griffith." Rather, Ned argues that there are other values which underlie the substantial relationship-disqualification test.

First, Ned asserts that the attorney's duty of loyalty to the client is maintained by assuring that an attorney does not violate the former client's trust by simply turning around and opposing a position he took in his earlier representation. Second, Ned contends that such a rule would require attorneys to avoid the appearance of impropriety, which he states is "essential to preserving the public's faith and confidence in the integrity of the judicial system." Therefore, Ned argues, the substantial relationship test should apply even if no confidential information is acquired during the course of the former representation. We agree.

Other courts which have considered this issue are split. For example, in *Collatt v. Collatt*, 99 Or.App. 463, 782 P.2d 456 (1989), the Oregon court of appeals upheld the disqualification of the plaintiff's attorney in an action challenging the transfer of a close corporation's stock from the plaintiff to his parents. The attorney had previously represented the parents at the meeting in which the transfer took place, and had prepared all of the necessary documents at the direction of the parents. In rejecting the plaintiff's

---

**7.** We note that most of the cases discussed below are attorney disqualification cases rather than attorney malpractice cases. Ultimately, actions which constitute a violation of professional ethics rules may not constitute actionable legal malpractice. However, professional ethics rules are evidence of the scope of the duties owed by an attorney to a client or former client. *See, e.g., Elliott v. Videan*, 164 Ariz. 113, 791 P.2d 639, 642 (App.1989). Since this case turns on the Firm's duty to Ned, it is appropriate to look to the attorney disqualification cases for guidance.

**8.** The substantial relationship test has been incorporated in Alaska Rule of Professional Conduct 1.9(a) (effective July 15, 1993). That rule bars a lawyer from representing a new client "in the same or a substantially related matter in which [the present client's] interests are materially adverse to the interests of the former client...."

argument that the attorney "neither rendered legal advice nor was privy to any of the defendants' confidences," the court noted that the plaintiff misunderstood the nature of the duties imposed by the conflicts rule:

> In fact, [the conflicts rule] both "protects client confidences from intentional or inadvertent disclosure and promotes the virtue of loyalty." Even if [the attorney's] representation of [the mother] did not provide him with confidential information whose use would be likely to inflict damage on her in plaintiff's action for conversion and duress, thereby creating an "information specific" conflict, it clearly would conflict with her interests in the matter in which he earlier represented her, generating a "matter specific" conflict.

*Id.*, 782 P.2d at 458 (citation omitted).[9]

However, some courts have taken the position advanced by the Firm, that where it is clear that no confidential information was disclosed during the course of the former representation, there can be no conflict of interest:

> [T]he determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought. The rule does not necessarily involve any inquiry into the imponderables involved in the degree of relationship between the two matters but instead involves a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other. The effect of the Canons is necessarily to restrict the inquiry to the possibility of disclosure; it is not appropriate for the court to inquire into whether actual confidences were disclosed.

*Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 224 (7th Cir.1978).[10] This line of cases generally emphasizes that policies which favor allowing litigants to use the counsel of their choice require careful scrutiny of the potential for disclosure of confidences before disqualification is required. *See, e.g., Satellite Fin. Planning*, 652 F.Supp. at 1283.

Additionally, our own decisions are relevant to resolution of the issue. First, in *Aleut*, after enunciating the substantial relationship test, we noted that these principles could be inferred from Ethical Considerations 4–5, 4–6 and 9–6 of the Code of Professional Responsibility. *Aleut*, 573 P.2d at 475 n. 2. While EC 4–5 and 4–6 concern the duty of confidentiality owed to an attorney's clients and former clients, EC 9–6 is concerned more generally with upholding the integrity of the profession by avoiding both actual improprieties and appearances of impropriety.

More recently in *In re Estate of Adkins*, 874 P.2d 271 (Alaska 1994), we upheld a superior court's refusal to disqualify an attorney representing an estate. The attorney was originally retained as tax counsel for the estate by the decedent's son who was serving as the estate's administrator. The son later resigned as administrator and was replaced by his sisters, who retained the attorney as lead counsel for the estate. The son then moved to disqualify the attorney.

Quoting *Aleut*, we noted that either the disclosure of confidential information or a substantial relationship between the subject matter of the present and former representations was sufficient to disqualify the attorney. We then noted that "[the former client] has not shown that [the attorney's] continuing representation of the Estate ... was in any way adversarial or prejudicial to [his] interests. Moreover, [he] fails to describe any specific confidences that were or might have been violated by [the attorney's] continuing representation of the Estate." *Estate of Adkins*, 874 P.2d at 273. Thus, we decided that even if no confidences were disclosed in the former representation, an attorney should be

---

**9.** *See also E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 394 (S.D.Tex.1969); *Berg v. Marine Trust Co., N.A.*, 141 Wis.2d 878, 416 N.W.2d 643, 649 (App.1987).

**10.** *See also Satellite Fin. Planning Corp. v. First Nat'l Bank*, 652 F.Supp. 1281, 1283 (D.Del.1987) ("Court ... should undertake 'a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other.' ").

disqualified if there is a substantial relation between the subject matter of the present and former representations, and if the current client's position is adverse or prejudicial to that of the former client.

*Gabianelli v. Azar*, 777 P.2d 1167 (Alaska 1989), also bears on this question. *Gabianelli* did not concern a situation where an attorney was disqualified because of a prior representation. Rather, the superior court determined that disqualification was appropriate because of the attorney's personal relationship with the opposing party's accountant. We reversed the superior court, holding that the appearance of impropriety alone was not sufficient to warrant disqualification under Canon 9. *Id.* at 1169. In reaching this decision, we noted that Canon 9 is somewhat vague and that therefore "[s]ome courts look to other ethical canons to establish the contours of the conduct proscribed by Canon 9." *Id.* at 1168. Standing alone, this might be taken to suggest that, at the very least, a showing of the potential for the disclosure of confidential information would have to be made to disqualify an attorney. However, we went on to state: "In the instant case, which lacks the unseemly element of an attorney taking a position adverse to a former client, Azar should have demonstrated at least a reasonable possibility that [the attorney] acquired privileged or confidential information...." *Id.* at 1169. Thus, a showing that confidential information might have been disclosed is necessary only if the attorney is not taking a position adverse to the former client.

Finally, we note Charles W. Wolfram's informative discussion of the duties that attorneys owe to former clients.[11] Wolfram states: "[L]awyers are generally prohibited from attacking their own work done for a former client, even if there is no threat to the first client's confidential information." *Id.* at 362. He cites several cases for this proposition, and also notes that *T.C. Theatre Corp.*, which is commonly viewed as the source of

the substantial relationship test, relied partially on the loyalty principle owed clients as well as the confidentiality rationale. *Id.* at 368.

We conclude that, as a general rule, a duty is owed on the part of an attorney to a former client to avoid representation if either (a) there is a potential that confidential information may be revealed or (b) the subject matters are substantially related and the attorney is taking a position directly adverse to the client's position in the former representation.

**2. A scrivener's exception may apply.**

**a. There is a genuine issue of material fact as to whether the Firm acted as a mere scrivener for Ned Griffith.**

■ Ned argues that summary judgment was inappropriate because a genuine issue of material fact exists with regard to the scope of services provided by the Firm when Ned met with Jill Dean in 1984. Ned contends that the Firm provided him with legal advice as to whether a quitclaim deed would be adequate to secure the debt owed him by Joe. The Firm argues that Ned merely sought advice as to the formal requirements of a quitclaim deed, as well as assistance in preparing the necessary papers.

At her deposition, Dean had no recollection regarding her meeting with Ned. Nor could the Firm offer any evidence that the only service it provided was the preparation of a quitclaim deed.

For his part, Ned first argues that the scope of the Firm's legal representation is in part governed by his intent or purpose in seeking the Firm's assistance and that summary judgment is an inappropriate means to resolve issues of intent. However, it is unreasonable to hold the Firm liable based merely on Ned's unarticulated subjective intent as to the scope of the Firm's legal representation.[12] Thus, in order to successfully oppose summary judgment, Ned must

**11.** Charles W. Wolfram, *Modern Legal Ethics* 358–375 (1986).

**12.** *See Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981) ("'[T]he court must look to express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement.'").

have presented some evidence reasonably tending to show that he sought legal advice regarding the use of a quitclaim deed as security.[13]

Review of the record discloses that Dean did furnish some legal advice. She advised Ned that in Alaska Joe Griffith's wife's signature would not be needed on the quitclaim deed. Also, Ned testified that after he spoke to Dean, "[s]he called up some places to see, to make sure it was his property, to make sure everything was legal and it was okay.... I went to see her in the morning and she did research and the other stuff on the property...."

Ned next argues that the subject matter code which was assigned by the Firm to his case, the creation of a physical file and trust ledger account, and the fee charged, are all inconsistent with the simple preparation of a quitclaim deed. Ron Offret, the supervising attorney of the Fairbanks office of the Firm, testified at his deposition that in the case of simple transactions such as the preparation of a quitclaim deed, the Firm generally would assign a subject matter number ending ".2000," would not open up a file or a trust fund ledger account, and would charge a fee ranging from $25 to $35. Ned then points to the ledger account to show he was charged $150. Offret was unable to explain why this particular subject matter code was used or why a physical file was opened.[14]

Ned also points out that on the client intake sheet Dean wrote "Sale of Property," which Ned interprets as "suggesting more was involved than mere scrivening of a deed." However, Ned does not explain how this notation is either inconsistent with the preparation of a deed or connotes that Dean did more. In short, the notation makes it no more likely that services beyond the creation of a quitclaim deed were provided, and is

therefore insufficient to create a factual dispute.

Finally, Ned points to his response to one of the Firm's interrogatories which asked for "[t]he details ... establishing the causation between specific acts ... of either of the Defendants and the particular element of damage claimed." Ned's answer states that he went to the Firm

> seeking advice regarding securing moneys, time and labor I was expending on developing 1543 Porchet Way. I was advised by Defendant law firm that I would be secured by the 1984 Quit Claim Deed from my father, Joe Griffith, to me. I have since found out that this method of securing my interest in the property probably was not a very good way to do it.

At his deposition, Ned stated that he met with Dean for twenty to thirty minutes and that his main question was whether his mother had to sign the deed as well as his father. Ned was then asked, "Now, did you talk to her about anything other than what you have already described about this question as to whether you needed to have [your mother's] signature on this document?" He responded, "No."

In reviewing this evidence, we draw all reasonable inferences in favor of Ned, the non-movant. *Wright*, 824 P.2d at 720. Additionally, where there is conflicting evidence with regard to a party's version of the disputed events, the issue becomes one of credibility and should generally be resolved at trial. *Wilson v. Pollet*, 416 P.2d 381, 384 (Alaska 1966). In light of the evidence discussed above, we hold that there is a genuine issue of material fact as to the scope of services which the Firm provided. As such, we reverse the superior court's grant of summary judgment because of the existence of a dis-

---

**13.** A material issue of fact exists where reasonable jurors could disagree on the resolution of a factual issue. *Air Van Lines v. Buster*, 673 P.2d 774, 778 (Alaska 1983).

**14.** We also note that there is some ambiguity as to why the $150 entered on the ledger was returned to Ned. The $150 deposit may be associated with the Firm's representation of Ned on a misdemeanor charge. This would also explain the creation of the trust ledger account. It

seems that the Firm represented Ned on several cases. The first time Dean was consulted in the current case was April 1984. The Firm's records indicate some kind of contact with Ned in 1983, on May 3, on September 29, and on October 11. These contacts could not have concerned the misdemeanor—for which Ned consulted with the Firm—because they were a year prior to the entry for that case, on August 13, 1984. They also have different matter numbers.

pute as to a material fact and for the reasons discussed below.

### b. The Firm may have owed a duty of loyalty to Ned on the facts of this case.

■ As discussed previously, attorneys owe both a duty of confidentiality and a duty of loyalty to former clients. The duty of loyalty prohibits an attorney from representing a new client in a matter that is substantially related to the first matter, when the positions which the attorney takes are adverse to each other.

However, at least one treatise notes the existence of a "scrivener's exception" to the substantial relation test. *Wolfram* at 372–73. According to Wolfram, some courts have held that "if a lawyer was retained only to draft a document, the lawyer can later represent an adversary of the former client in a substantially related matter." *Id.*

The exact scope of the scrivener's exception is unclear. Wolfram's discussion of the doctrine implies that it implicates only the duty of confidentiality which an attorney owes to a former client. That is, the doctrine seems to provide that where an attorney acts as a mere scrivener, and no confidences exist between the attorney and the former client, it is impossible for the attorney to violate the duty of confidentiality. As defined by Wolfram, the doctrine is not a real exception, but rather is a truism which states that an attorney does not breach the duty of confidentiality where there were no confidences to be divulged. One case which Wolfram cites in support of the doctrine, *Mildfelt v. Lair*, 221 Kan. 557, 561 P.2d 805, 815 (1977), applies the doctrine in just this manner. *See also Towns v. Towns*, 36 Cal.App.2d 88, 96 P.2d 971 (1939).

■ However, we think that the scrivener's exception can also operate as a bona fide exception to the general duty of loyalty which an attorney owes to a former client.[15] As we envision such a rule, an attorney owes no duty of loyalty to a former client where the attorney acts in such a manner that a reasonable client would not expect the attorney to have assumed a continuing duty of loyalty to the client. Such a situation exists where the attorney merely fashions a statutory form of deed, or performs other clerical or ministerial tasks.

■ This exception should, of course, be construed extremely narrowly. Therefore, if the attorney furnishes any legal advice to a client, or in any way makes use of her or his legal skills, the exception will not apply. Additionally, if the client divulges any confidences to the attorney during the course of representation, the attorney's duty of confidentiality is triggered, even if the attorney is merely acting as a scrivener. More importantly, we think that a bona fide scrivener's exception is defensible on policy grounds and should be adopted.

We are aware of the potential pitfalls of such a rule. First, many clients assume a certain amount of loyalty from their attorneys, even when they ask their attorneys to perform merely clerical or ministerial tasks. Adoption of the scrivener's exception increases the risk that attorneys will defeat this expectation of loyalty. Additionally, there are problems in administering this exception. That is, were we to reject the scrivener's exception, what would remain is an easily followed, bright-line rule to the effect that in a matter substantially related to work performed for a former client an attorney could never take a position materially adverse to the interests of the former client.

These potential problems can be minimized by a strict construction of the scrivener's exception; namely, that it will only apply to

---

15. Wolfram disagrees. He states: "Conflicts rules aim to protect against more than the misuse of information that falls within the narrow limits of the privilege. Scriveners who are lawyers are also under an obligation of loyalty that should alone suffice to prevent them from attempting to upset their own work." *Id.* at 325.

Additionally, the Comment to Alaska Rule of Professional Conduct 1.9 arguably would prohibit using the scrivener's exception to nullify the duty of loyalty. The Comment states, "[A] lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client." However, if the lawyer merely copied a contract or other document from a book of forms, the attorney did not truly draft the document, and the prohibition would not apply.

purely clerical tasks which attorneys perform. If such a purely clerical task constitutes the entirety of the attorney-client relationship, then most reasonable clients will not expect an ongoing duty of loyalty from the attorney. Similarly, when construed in such a limited manner, administration of the exception becomes practical. This is so because the doctrine should apply only in those rare cases where the attorney is not privy to any confidences of his or her client, and where the attorney's services are of a purely clerical nature.

■ The adoption of the scrivener's exception furthers the goal of allowing clients a reasonable choice of legal counsel.[16] Also, it allows attorneys to represent new clients when that representation does not violate a former client's reasonable expectation of loyalty.[17]

In the case at bar it is unclear whether the Firm acted as a mere scrivener, or whether its actions triggered a duty of loyalty to Ned. Therefore, on remand, the exact nature of the services provided by the Firm must be established. If it is determined that the Firm acted as a mere scrivener, then the scrivener's exception would apply, and it

would follow that the Firm owed no duty to Ned at the times it subsequently represented Joe. If this result is reached, then the other issues on appeal relating to the Firm will be rendered moot. However, if it is determined that the Firm owed Ned a duty of loyalty due to the scope of services it provided him, then the superior court should consider the remaining elements of Ned's claim against the Firm.[18]

We now address the other issues in this appeal which are applicable to the instant case in the event the superior court holds that the Firm owed a duty to Ned.

B. *The Superior Court Correctly Concluded that Ned had Not Sufficiently Pled the Issue of Jill Dean's Negligence.*[19]

■ In its written decision, the superior court refused to consider Ned's argument that Jill Dean's negligence facilitated Joe's ability to deprive Ned of the property. Apparently, Ned sought to prove at trial that he approached Jill Dean to obtain advice as to the best method of securing his claim against Joe, that she advised him that a quitclaim deed was the best method of doing so, and

---

**16.** *See* Comment to Alaska Rule of Professional Conduct 1.9.

**17.** Our adoption of the scrivener's exception does affect the Alaska Rules of Professional Conduct. As we noted previously in this opinion, Rule 1.9(a) has adopted the "substantial relation" test. Specifically, the rule states:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

From our above discussion of the scrivener's exception, it should be clear that when an attorney performs a purely ministerial or clerical function for a client, and subsequently takes on another case which requires him or her to take a position materially adverse to the work performed for the first client, there is no substantial relationship between the two matters. Therefore, in the rare instance where the scrivener's exception applies, the attorney can forgo receiving the consent of the former client, without running afoul of Rule 1.9(a).

We are aware that Rule 1.7 also contains the substantial relation test. That rule deals with

conflicts of interest between a lawyer's current clients. However, we express no opinion as to whether the scrivener's exception also applies to that situation.

**18.** The Firm argues on cross-appeal that we should uphold the superior court's grant of summary judgment on the alternative ground of a lack of proximate causation. We decline to do so because the superior court did not rule on the causation issue, deeming it moot in light of its decision that no duty existed.

On remand the superior court should also address Ned's argument that the Firm owed a duty to avoid even the appearance of impropriety. We note, however, that the law frowns upon imposing disciplinary action based solely on the appearance of impropriety. *See* Comment to Alaska Rule of Professional Conduct 1.9 ("since 'impropriety' is undefined, the term 'appearance of impropriety' is question-begging. It therefore has to be recognized that the problem of disqualification cannot be properly resolved ... by the very general concept of appearance of impropriety."). *See also Gabianelli,* 777 P.2d at 1169.

**19.** Questions involving amendments to pleadings are reviewed for an abuse of discretion. *Revelle v. Marston,* 898 P.2d 917, 928 (Alaska 1995).

that such advice was negligent because it facilitated his father's conveyance of the property to himself by use of his power of attorney.

In determining whether Ned sufficiently pled a negligence claim against Jill, we look to the requirements of Alaska Civil Rule 8 and its underlying purposes. Civil Rule 8(a) states in part:

A pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim or third party claim, shall contain (1) a short and plain state-ment of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks.

Furthermore, Civil Rule 8(e)(1) states, "[E]ach averment of a pleading shall be sim-ple, concise and direct. No technical forms of pleading or motions are required." Final-ly, Rule 8(f) requires that "[a]ll pleadings shall be so construed as to do substantial justice."

■■■■ In interpreting this rule, this court has noted that "[p]leadings are intend-ed to serve as a means of arriving at fair and just settlements of controversies between liti-gants. They should not raise barriers which prevent the achievement of that end." [20] Generally, the complaint's function is to put the opposing party on notice "of the nature of the claim being asserted," [21] leaving it to discovery and other pretrial procedures to narrow the issues.[22] Additionally, we have stated that "a party should be granted the relief to which he is entitled under the evi-dence, regardless of the theory of his plead-ings." *Brayton v. City of Anchorage,* 386 P.2d 832, 833 (Alaska 1963).

Thus, we must decide, in light of these liberal pleading rules, whether Ned's com-plaint can reasonably be construed so as to include the claim involving Jill Dean's alleged

negligence. Examination of the record Ned submits to support his claim leads us to conclude that the complaint cannot be so construed.

■■■■ Counts one through three of both the complaint and the amended complaint focus on the actions of Taylor and the duty of the Firm to inform Ned of a potential conflict of interest. To the extent that the com-plaints mention Jill Dean, it is by way of background factual information. In this re-gard, paragraph 7 of Ned's complaint [23] reads as follows:

In order to satisfy the past debts, as well as provide compensation for labor and ma-terials, Plaintiff and his father Joe Griffith agreed to secure the debt by transferring the property to Ned Griffith by way of Quitclaim Deed. Before doing so, Plaintiff sought the advice and legal counseling of the Defendant law firm with regard to this transaction. Jill Dean, an associate of De-fendant Aglietti, Pennington & Rodey, counseled the Plaintiff regarding securing an interest in the property [sic] to protect Plaintiff. Jill Dean failed to properly in-dex the conflict file. Having advised the Plaintiff, Defendant prepared a Quitclaim Deed and recorded same for and on behalf of their client, Plaintiff Ned Griffith.

Ned additionally claims that interrogatory "responses placed the Firm on notice of the nature of his claims so as to render the existing pleadings sufficient." Specifically, to show that the Firm should have been on notice that he was going to prosecute the negligence claim based on Jill Dean's actions, Ned cites an answer to an interrogatory where he states that "I have since found out that this method of securing my interest in the property [i.e., use of a quitclaim deed] probably was not a very good way to do it." Further, to demonstrate that the Firm had

---

20. *Mitchell v. Land,* 355 P.2d 682, 687 (Alaska 1960) (quoting *Maty v. Grasselli Chem. Co.,* 303 U.S. 197, 200, 58 S.Ct. 507, 509, 82 L.Ed. 745 (1938)).

21. *Martin v. Mears,* 602 P.2d 421, 427 (Alaska 1979).

22. *Schaible v. Fairbanks Medical & Surgical Clin-ic, Inc.,* 531 P.2d 1252, 1256 n. 16 (Alaska 1975).

23. The complaint at issue is Ned's "First Amend-ed Complaint." Ned was granted leave to amend pursuant to Civil Rule 15(c) in order to include the previous partnership of Aglietti, Pen-nington & Rodey as a defendant, as well as its successor Aglietti, Rodey & Offret named in the original complaint.

actual notice of Ned's intention to prosecute the negligence claim, he points to a Expert Witness List prepared by the Firm. The list states that one of the Firm's experts would testify about various aspects of how to use real estate and quitclaim deeds for security, as well as about the other actions taken by the firm in 1985 and 1987.

None of those portions of the record relied on by Ned can be construed as satisfying Civil Rule 8(a), which requires the pleader, at minimum, to submit "a short and plain statement of the claim showing that the pleader is entitled to relief." The three counts focused on actions of Taylor. The information in the pleadings regarding Jill Dean served to provide background information, and did not indicate that any relief was sought based on her conduct. Without more, the Firm could not reasonably be expected to be on notice that Dean's actions or inactions were at issue.

Furthermore, Ned's answer to the interrogatory noted above was insufficient to impart notice to the Firm that negligence was at issue.[24] Finally, the Firm's witness list does not demonstrate that the Firm had actual notice of the negligence claim. Rather, it shows that the Firm intended to put on testimony as to how Ned had used the quitclaim deed for the property to secure his claim against Joe. That is, the Firm nowhere denies that the quitclaim deed was used as security. Therefore, its intent to offer testimony regarding use of a quitclaim deed as security does not indicate that the firm had notice that the question of Jill Dean's advice was at issue.

Therefore, we affirm the superior court's ruling that Ned did not properly plead the issue of Jill Dean's negligence.

**24.** Indeed, this court has previously stated:
> [T]here is no suggestion ... that the mere mention of a new theory in interrogatories or depositions might suffice to require amendment under Civil Rule 15(b). Such a position would, in our view, clearly be unsound as it would require counsel to comb through all the discovery adduced from an adverse party and make motions to strike answers which are suggestive of unpled theories.

## C. The Superior Court Erred in Dismissing the Claims Against Taylor Individually.[25]

The superior court held that Taylor could not be held personally liable for violating the duty of an attorney to avoid conflicts of interest. The superior court reasoned that because Taylor was not employed by the Firm when Ned was a client, he could not personally have acquired any duties or contractual obligations to Ned. Also, the court reasoned that, as an agent of the Firm, Taylor could not be held liable for breach of contract by the principal even if that breach was carried out by him under his agency.

It is well established that "[a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal...."[26] The mere fact that the duty which the attorney owes to the client arose vicariously out of the attorney's affiliation with the principal firm, or that the firm's duty arose out of dealings with the client which occurred before the attorney joined the firm, does not affect this rule. We have said, "The law is well established that in the event of negligence by a disclosed agent acting within the scope of his authority, the agent may be personally liable to a third party." *Austin v. Fulton Ins. Co.*, 498 P.2d 702, 704 (Alaska 1972). Thus, if the Firm, acting through Taylor, is liable for failing to contact Ned before preparing the deed for Joe's signature, or for failing to decline to represent Joe when asked that a deed in Ned's name be prepared, Taylor can be individually liable for the same failures. His duty as an employee of the Firm arises from a prior lawyer/client relationship between the Firm and Ned, and that duty is

*Superior Fire Protection Co. v. Du Alaska Co.*, 772 P.2d 1088, 1089 (Alaska 1989).

**25.** This issue requires that we construe the law of agency. As such, it is a question of law and is reviewed *de novo*. *Taylor v. McGlothlin*, 919 P.2d 1349, 1351 n. 3 (Alaska 1996).

**26.** *Restatement (Second) of Agency* § 343 (1958).

independent of when Taylor became an employee of the Firm.[27]

Therefore we reverse the superior court on this issue.

D. *The Superior Court Should Determine Whether the Firm Was Collaterally Estopped from Relitigating Issues Litigated in Griffith v. Griffith.*

Ned also appeals the superior court's denial of his motion seeking to collaterally estop the Firm from relitigating issues resolved in *Griffith v. Griffith.* Ned contends that, although the Firm was not a party to the prior litigation, under a variety of theories it was fully and fairly represented in the earlier litigation. The superior court did not rule on this motion, presumably because its decision to grant the Firm's summary judgment motion mooted this issue.

Meaningful appellate review of this issue is difficult, if not impossible, in the absence of factual findings by the superior court regarding the Firm's participation in the prior action. Therefore, we remand this issue for resolution in accordance with this opinion.

E. *The Superior Court Should Enter an Order Identifying the Real Party in Interest.*

The Firm argues on cross-appeal that Ned assigned all proceeds from this lawsuit to the law firm of Staley, DeLiso, Cook & Sherry, Inc., and that therefore Ned is no longer the real party in interest. As such, the Firm asks us to affirm the dismissal of Ned's claims pursuant to Civil Rule 17(a), which states that "[e]very action shall be prosecuted in the name of the real party in interest."

However, Rule 17(a) further states that "[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." We have held that before dismissing an action pursuant to Rule 17(a) the court must first enter an order identifying the real party who must ratify the action or join it within the reasonable time given. *KOS v. Williams,* 616 P.2d 868, 870 (Alaska 1980). On remand the superior court should enter an appropriate order pursuant to Civil Rule 17(a).

IV. *CONCLUSION*

The superior court's grant of summary judgment in favor of the Firm is REVERSED, and this aspect of the case is REMANDED for proceedings consistent with this opinion. The superior court's grant of summary judgment in favor of Warren Taylor II is REVERSED.

MOORE, C.J. and EASTAUGH, J., not participating.

---

27. At the very least, the burden is on Taylor to demonstrate that he exercised reasonable care to ensure that he was not acting contrary to the interests of a former client of the Firm.