**Fred Jackson McCORMICK and Hillbilly Enterprises, Inc., Appellants,**

v.

**CITY OF DILLINGHAM, a municipal corporation, Appellee.**

**No. S–9037.**

Supreme Court of Alaska.

Jan. 26, 2001.

---

R.R. De Young, Wade & De Young, APC, Anchorage, for Appellants.

Brooks W. Chandler and Krista S. Stearns, Hicks, Boyd, Chandler & Falconer, Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

### I. INTRODUCTION

Fred McCormick operated a construction company in Dillingham. Contending that Dillingham's business license fee and sales tax were invalid, McCormick refused to pay or collect either. Dillingham sued McCormick personally to collect the fees, taxes, and penalties that it believed McCormick owed. The superior court granted partial summary judgment to the city, concluding that the license fee and sales tax were valid. After a bench trial, the superior court further determined that McCormick should be held personally liable. We affirm the superior court on all issues.

### II. FACTS AND PROCEEDINGS

#### A. The Sales Tax Ordinance

McCormick and his company, Hillbilly Enterprises, Inc., have refused to collect and pay the Dillingham sales tax. McCormick alleges that the sales tax was repealed in 1977 and never legally reenacted. Dillingham sued McCormick for withholding his company's books from an audit and failing to pay the sales tax. Dillingham filed for summary judgment, and Superior Court Judge Pro Tem William H. Fuld concluded that the Dillingham sales tax was valid.

#### B. The Business License Ordinance

Contending that Dillingham enacted its business license ordinance illegally, McCormick has refused to pay it. The city sued to collect the license fees, and McCormick filed a motion for partial summary judgment seeking to have the ordinance declared void. Dillingham filed an opposition and cross-motion for summary judgment, demanding that McCormick obtain a business license and pay penalties for his non-compliance. The superior court concluded that the business license ordinance was valid. McCormick appeals, arguing that state law preempts Dillingham's business license ordinance and that Dillingham failed to comply with public notice requirements.

#### C. Piercing the Corporate Veil

After the trial court determined that the sales tax and business license fees were valid, Dillingham sought to collect back taxes, fees, and penalties from McCormick and his business, Hillbilly Enterprises. Although Dillingham sought recovery based on a de facto partnership theory, Superior Court Judge Dan A. Hensley directed the parties to prepare for a trial to determine whether to pierce Hillbilly's corporate veil and hold McCormick personally liable.

After hearing the evidence at trial, the superior court pierced Hillbilly's corporate veil. The court entered a final judgment of

$51,696.58 in favor of Dillingham; this amount consisted of the back taxes and fees, pre-judgment and post-judgment interest, and attorney's fees. McCormick appeals.

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo.[1] We uphold a grant of summary judgment when the record presents no genuine issue of material fact and one party is entitled to judgment as a matter of law.[2] When considering whether the moving party is entitled to summary judgment, we construe the facts in the light most favorable to the non-moving party,[3] and we review the trial court's factual findings under the clearly erroneous standard.[4]

## IV. DISCUSSION

### A. The Dillingham Sales Tax Ordinance Was Valid.

#### 1. The 1977 repeal and reenactment

Dillingham first approved a sales tax in 1966. Although the original sales tax ordinance, Ordinance 13, is no longer a part of Dillingham's city records, Amendment A to Ordinance 13, which amended the original sales tax ordinance in 1967, has survived. In 1977 Dillingham undertook an effort to codify its city ordinances. In doing so it passed Ordinance 77–10. Ordinance 77–10 repealed the sales tax ordinance and simultaneously enacted Title 8, which was to be titled "Taxation and Special Assessments." But Ordinance 77–10 did not clearly indicate the ordinances that were to be reenacted as Title 8. Instead, Ordinance 77–10 stated that these would be "more particularly set forth in Exhibit A attached hereto." Although Exhibit A has not survived in Dillingham's records, a

sales tax similar to the original sales tax ordinance appeared in Title 4, rather than Title 8, of the codification of the Dillingham municipal code.[5] McCormick maintains that because Exhibit A cannot be found, it should be assumed that Ordinance 77–10 repealed the sales tax and did not reenact it.

McCormick argues that he has generated a genuine issue of material fact as to whether Dillingham properly reenacted its sales tax in 1977. But he has the burden of overcoming the "presumption that proceedings of the governing body of a municipality have been conducted in accordance with the law."[6] McCormick argues that because Dillingham has been either unwilling or unable to produce Exhibit A of Ordinance 77–10 and because the sales tax appears in Title 4 of the Dillingham Municipal Code, rather than Title 8 as directed by Ordinance 77–10, he has overcome the presumption that Dillingham acted in compliance with the law.

To overcome the Liberati presumption of government regularity,[7] however, McCormick must do more than point to a lost exhibit or the mislabeling of the municipal code. Ordinance 77–10 was not a drastic change in policy for the city of Dillingham. Instead, it was an effort to codify the municipal ordinances, which had included a sales tax for ten years. The published municipal code and Ordinance 13, the earliest surviving Dillingham sales tax ordinance, contain the same organization and substantially identical language. Moreover, the codified municipal ordinance refers to section 2 of Ordinance 77–10, which is the portion referring to the missing Exhibit A, as the source for the sales tax ordinance.

Although McCormick can point to anomalies in the codification of the sales tax in

---

1. See Mount Juneau Enters., Inc. v. City & Borough of Juneau, 923 P.2d 768, 772–73 (Alaska 1996).

2. See Semlek v. National Bank of Alaska, 458 P.2d 1003, 1005–06 (Alaska 1969).

3. See Zeman v. Lufthansa German Airlines, 699 P.2d 1274, 1280 (Alaska 1985).

4. See Parker v. Northern Mixing Co., 756 P.2d 881, 887–88 n. 11 (Alaska 1988).

5. Although Ordinance 77–10 calls for the "Taxation and Assessment" ordinance to appear in Title 8, Dillingham explains the fact that the sales tax appears in Title 4 because of a decision of the publisher.

6. Liberati v. Bristol Bay Borough, 584 P.2d 1115, 1118 (Alaska 1978); see also City of St. Mary's v. St. Mary's Native Corp., 9 P.3d 1002, 1009 (Alaska 2000).

7. See 584 P.2d at 1118.

1977, he has not established that the city failed to comply with the law. Instead, he has asked the court to infer that the city council conspired to illegally revive substantially the same sales tax ordinance that it repealed in Ordinance 77–10 when it codified Dillingham's ordinances. But the 1980 version of the Dillingham Municipal Code states that Ordinance 77–10 is the legal authority for the codification of the sales tax. We therefore agree with the superior court that McCormick has failed to present sufficient evidence to overcome the presumption that Dillingham lawfully passed its sales tax.

### 2. The 1989 increase in the rate of levy

In 1989 the city council again addressed the Dillingham sales tax .[8] The city sought to increase the tax rate from three percent to five percent by passing Ordinance 89–03. Because the ordinance was "an increase in the rate of levy of a sales tax," Dillingham held the statutorily required public vote to ratify the tax.[9] The voters approved the increase.

McCormick objects to Ordinance 89–03 because he claims that the city misled voters by referring to the existing sales tax, which he claims the council repealed in 1977. McCormick posits that because Dillingham failed to "fully inform[ ]" the voters, the election results were invalid. But because we conclude that Dillingham had a valid sales tax prior to the 1989 vote, McCormick's argument rests on a flawed premise. Moreover, the results of the ratifying vote demonstrate that the voters were aware of and approved the Dillingham sales tax.[10]

### 3. The 1992 modification

In 1992 Dillingham became aware that its failure to publish notice in a newspaper of general circulation called into question all of its city ordinances.[11] In response, the council adopted Ordinance 92–18 requiring publication of all public notices in a newspaper of general circulation in Dillingham. The city manager recommended that the mayor and city council reenact all of the revenue ordinances after providing public notices. The city also considered Ordinance 92–14, which raised the cap on the value of transactions subject to the sales tax from $1,000 to $2,000. The city prepared notice of the public hearing, published it in the *Bristol Bay Times,* and ultimately passed the ordinance. But McCormick challenges the validity of the ordinance on the grounds that the city failed to notify the public that it had no valid sales tax.

We reject McCormick's challenge to Ordinance 92–14, which raised the cap on the value of transactions subject to the sales tax from $1,000 to $2,000. Because we conclude that Dillingham had a valid sales tax, McCormick's argument that Dillingham did not notify the public that it had previously repealed its sales tax has no merit.

### B. The Dillingham Business License Ordinance Was Valid.

Dillingham also brought a claim against McCormick for his failure to obtain and pay for the city business license. The city originally passed the license fee as Ordinance 92–07 in June 1992. McCormick argues that the city did not provide adequate notice of the

8. In 1986 Dillingham had undertaken another effort to reorganize its municipal code by passing Ordinance 86–10. The ordinance repealed, reorganized, and reenacted Title 4 of the Dillingham Municipal Code. Because the ordinance did not repeal Title 8, which according to Ordinance 77–10 should have been the sales tax provision, and reenact it as Title 4, McCormick contends that Dillingham was attempting to resurrect its repealed sales tax. But again McCormick has failed to overcome the presumption that the Dillingham sales tax was reenacted in compliance with the law in 1977. Thus, we need not address the superior court's conclusion that the city council cured any discrepancies when it passed Ordinance 86–10 in 1986.

9. See AS 29.45.670 ("A new sales and use tax or an increase in the rate of levy of a sales tax approved by ordinance does not take effect until ratified by a majority of the voters at an election.").

10. We also note that Dillingham only sought from McCormick and his business the payment of sales taxes due since 1990, after the voters had ratified the Dillingham sales tax.

11. See AS 29.25.020(b)(3) (prescribing the requirements for notice of a hearing adopting a new tax).

hearing regarding the proposed business license fee. Dillingham, however, does not rely on Ordinance 92–07 when it asserts that it has a valid business license ordinance. Instead, it submits that it need not have complied with the public notice requirements in passing Ordinance 92–07 because it validly reenacted the business license when it passed Ordinance 92–13 in October 1992 as part of its effort to comply with the state statutory notice requirements. But McCormick argues that Dillingham's procedure in enacting Ordinance 92–13 was deficient as well.

The city council first introduced Ordinance 92–13 on August 20, 1992. The council set a public hearing for September 3, 1992. As required by statute,[12] Dillingham published notice in the *Bristol Bay Times* and posted the notice around Dillingham. The published notice stated that the purpose of Ordinance 92–13 was "[a]mending the Dillingham Business License Code." At the September 3 meeting, council members expressed concern that charitable endeavors were equally subject to the application fee. As a result, the council tabled the ordinance.

The council modified Ordinance 92–13 to address the council's concerns and set another public hearing for October 15, 1992. The city posted notice of this public hearing and also published notice in the *Bristol Bay Times*. But the council did not hold a public hearing on October 15 because it did not have a quorum. The city clerk rescheduled the meeting for October 21, 1992. Because the *Bristol Bay Times* is a weekly newspaper, there was insufficient time to publish notice of this meeting.[13] But notice of the rescheduled meeting was posted around town and publicized on the radio. At the October 21 meeting, the council passed Ordinance 92–13, reenacting the business license ordinance.

McCormick first argues that the city of Dillingham does not have the power to pass a business license ordinance because the state business license ordinance has preempted it. McCormick also claims that Ordinance 92–13 is invalid because no notice of the public hearing at which the ordinance passed appeared in a newspaper of general circulation. Finally, McCormick argues that Dillingham violated its own municipal code by passing Ordinance 92–13 at the October 21 meeting.

### 1. Preemption

■ McCormick's argument that the state business license law preempted Dillingham's ability to pass a local business license fee ordinance is incorrect. Dillingham may exercise "a power not otherwise prohibited by law." [14] Those powers include the power "to levy a tax." [15] McCormick argues that because the state charges a fee for a business license [16] and regulates construction contractors,[17] Dillingham is prohibited from assessing a fee for a business license. But McCormick points to no language in state law prohibiting a municipality from charging a fee for a business license. In the absence of such a prohibition or interference with the function of a state statute,[18] Dillingham may properly charge the fee.

■ Moreover, we have determined that "[m]erely because the state has enacted legislation concerning a particular subject does not mean that all municipal power to act on the same subject is lost." [19] Absent "an express legislative direction or a direct conflict with a statute," preemption exists "only

---

12. *See* AS 29.25.020(b)(3); AS 29.71.800(18).

13. The record indicates that the paper was published on Friday, October 9, 1992. If the Thursday, October 15 meeting were canceled late on that day, then it would have been impossible to publish notice of the rescheduled meeting in the next weekly edition of the paper, October 16, before the rescheduled meeting occurred on Wednesday, October 21, 1992.

14. AS 29.35.260(a); *see* AS 29.35.400 ("A liberal construction shall be given to all powers and functions of a municipality conferred in this title.").

15. AS 29.35.010(6).

16. *See* AS 43.70.030(a).

17. *See* AS 08.18.011–.171.

18. *See Kotzebue Lions Club v. City of Kotzebue*, 955 P.2d 921, 922 (Alaska 1998) (quoting *Liberati*, 584 P.2d at 1122).

19. *Liberati*, 584 P.2d at 1121–22.

where an ordinance substantially interferes with the effective functioning of a state statute or regulation or its underlying purpose."[20] McCormick presents no reason why Dillingham's regulation of local businesses cannot coexist with the state's regulation.

### 2. Dillingham's compliance with state and local notice requirements

McCormick argues that Dillingham has failed to comply with state and local notice requirements. Alaska Statute 29.25.020(b)(2) requires that "an ordinance shall be set by the governing body for a public hearing." Alaska Statute 29.25.020(b)(3) requires that for a hearing to be properly noticed, "[a]t least five days before the public hearing a summary of the ordinance shall be published together with a notice of the time and place for the hearing." Alaska Statute 29.71.800(18) defines "published" as "appearing at least once in a newspaper of general circulation distributed in the municipality, or if there is no newspaper of general circulation distributed in the municipality, posting in three public places for at least three days." Dillingham has not contested that the *Bristol Bay Times* was a newspaper of general circulation in 1992. Moreover, we have determined that compliance with AS 29.25.020(b)(3)'s publication requirement is mandatory in the context of a revenue-enhancing ordinance.[21]

But Dillingham complied with the state notice requirements. McCormick does not contest the fact that notice of the September 3 first public hearing regarding Ordinance 92–13 appeared in the *Bristol Bay Times*.[22] Alaska's public notice statutes require one public hearing regarding an ordinance.[23] And our prior cases establish that if an ordinance is amended after the initial public hearing, "[o]nly those changes to an ordinance which are so substantial as to change its basic character require that the public hearing process be repeated."[24] Accordingly, if Dillingham properly provided notice of the first hearing, and the amendments did not alter the basic character of the original proposed ordinance, it was then unnecessary to hold a second public hearing. Thus, any deficiency in the notice provided for the second hearing would constitute harmless error.[25]

The amendments considered at the second hearing regarding the ordinance, held on October 21, did not alter the basic character of the ordinance. The amendments merely exempted home businesses and non-profit organizations from the license fee. In *Jefferson v. City of Anchorage*,[26] we considered an ordinance setting the salary for the mayor of Anchorage. Although the original ordinance set the mayor's full-time salary, an amendment was presented at the meeting during which the ordinance was passed to set a lower salary for the mayor if he or she

**20.** *Kotzebue Lions Club*, 955 P.2d at 922 (quoting *Liberati*, 584 P.2d at 1122).

**21.** *See City of St. Mary's v. St. Mary's Native Corp.*, 9 P.3d 1002, 1010–12 (Alaska 2000).

**22.** McCormick argues that Ordinance 92–13 is invalid because the public notice mischaracterized the ordinance as an amendment rather than a reenactment. We have determined that a summary of a proposed ordinance "meets the statutory requirements so long as it describes clearly, if generally, what the proposed ordinance would accomplish." *Kotzebue Lions Club*, 955 P.2d at 924–25 (quoting *Fairbanks N. Star Borough v. College Utils. Corp.*, 689 P.2d 460, 462 (Alaska 1984)). In this case, the published summary did describe what proposed Ordinance 92–13 would accomplish. Proposed Ordinance 92–13 contained amendments to Ordinance 92–07. Differences in the two ordinances may be found in

Dillingham Municipal Code 4.16.030(C), and the penalty provision in Dillingham Municipal Code 4.15.060. In addition, the ordinance amended Chapter 6.04 of the Dillingham Municipal Code. Ordinance 92–13 was literally an "amendment" of Ordinance 92–07. The fact that the city council passed Ordinance 92–13 to cure a procedural deficiency is legally irrelevant.

**23.** AS 29.25.020(b)(2) only requires "a" hearing, not multiple hearings.

**24.** *Liberati*, 584 P.2d at 1119 (interpreting former AS 29.48.150(a) that contains language nearly identical to AS 29.25.020(b) with respect to passing amended ordinances).

**25.** *See Kotzebue Lions Club*, 955 P.2d at 924.

**26.** 513 P.2d 1099, 1100–01 (Alaska 1973).

elected to work part-time.[27] We concluded that such an amendment did not require repeating the hearing process.[28] Accordingly, a second hearing on the business license ordinance was also not required.[29]

Even though Dillingham complied with state notice requirements, however, we must still address whether it complied with local requirements. Specifically, McCormick argues that the Dillingham Municipal Code only allows an ordinance to be passed after a properly noticed hearing if it is "without amendment."[30] Dillingham, however, contends that the language in Dillingham Municipal Code 02.12.050 is not an accurate codification of Dillingham's ordinances. At oral argument before this court, counsel for Dillingham asserted that due to a printing error, the Dillingham code provision was not published accurately and that the relevant code provision as passed provides: "After the hearing, the council shall consider the proposed ordinance and may adopt it *with or without* amendment."[31]

The record reveals that the city council amended the relevant ordinance in 1986 when it passed Ordinance 86–8, retaining the "with or without" language. And McCormick has not challenged the authenticity of that ordinance. We therefore accept Dillingham's representations with respect to the content of its city ordinances and conclude that Dillingham Municipal Code 02.12.050 should read "with or without amendment."

▮ Because we conclude that Dillingham Municipal Code 02.12.050 should read "with or without amendment," it follows that the city council complied with the ordinance.[32] According to the Dillingham Municipal Code, once the city council held one properly noticed public hearing with regard to Ordinance 92–13, it could subsequently adopt the ordinance even with amendments.

C. *The Superior Court Did Not Err When it Pierced the Corporate Veil and Held McCormick Personally Liable for the Obligations of Hillbilly Construction.*

The corporate history of McCormick's construction business came to light at a bench trial regarding McCormick's personal liability for uncollected taxes, fees, interest, and penalties owed to the city. In 1990 McCormick incorporated his business under the name McCormick Construction and Maintenance, Inc. He and his wife, Tatiana McCormick, were the sole shareholders of the business, but McCormick ran the daily operations. In 1993 the corporation changed its name to Hillbilly Enterprises, Inc., and McCormick transferred his ownership interest to his wife so that the company could take advantage of contracts designated for minority businesses. McCormick continued to operate the business.

Hillbilly was never fully capitalized. It never owned any significant assets. McCormick himself continued to own and operate the construction equipment for the benefit of Hillbilly, but there was never a formal leasing arrangement between the company and McCormick.

The Hillbilly finances were not kept separately from the McCormick family finances. McCormick took out personal loans from the bank to pay corporate bills. McCormick also used the corporate bank account as his own personal account. Tatiana McCormick worked for the Dillingham School District, but had her checks deposited in the corporate account.

---

27. *See id.* at 1100.

28. *See id.* at 1102.

29. *See Liberati,* 584 P.2d at 1119.

30. Dillingham Municipal Code 02.12.050.

31. We accordingly ordered counsel for Dillingham to provide documentation to support this assertion, and we invited McCormick to respond. Dillingham's counsel complied with the order and no response was filed.

32. McCormick's argument that AS 29.45.670 required voter ratification of the business license fee is without merit. AS 29.45.670 requires voter ratification of "[a] new sales and use tax." Although McCormick argues that the business license fee is sufficiently like a sales tax to trigger the voter ratification requirement, he does not provide any legal authority to support his claim, nor is there any reasonable basis for labeling a $100 annual fee for doing business in Dillingham a "sales tax" for the purposes of AS 29.45.670.

Based on these factors, the superior court found that McCormick was personally liable for the debts of Hillbilly Construction. McCormick argues that the superior court committed several errors in reaching this decision. McCormick first asserts that the court erred by allowing the trial to proceed on the theory that Hillbilly's corporate veil should be pierced. He further argues that the superior court relied on erroneous factual findings when it made the legal determination that Hillbilly's corporate veil should be pierced.

1. *The superior court did not err in conducting a bench trial on the question of whether to pierce the corporate veil of Hillbilly Enterprises.*

■ McCormick argues that because Dillingham sought recovery from him on a theory of a de facto partnership and never pled the corporate veil theory, conducting a trial on that theory was erroneous. McCormick believes Dillingham never put him on notice that he could be held personally liable. But Dillingham made it clear from the outset that it would seek payment for unpaid taxes, fees, and penalties from McCormick. The initial complaint named him as the sole defendant. Only in its amended complaint, after McCormick had replied that he was only an employee of Hillbilly Enterprises, did Dillingham add Hillbilly Enterprises as a defendant.

The complaint provided McCormick with sufficient notice that he might be held responsible for Hillbilly's failure to pay Dillingham taxes. Our decision in *Griffith v. Taylor* establishes that if a party has notice of the conduct for which the opposing party is seeking relief, the opposing party may recover under any theory supported by the evidence:

[T]he complaint's function is to put the opposing party on notice of the nature of the claim being asserted, leaving it to discovery and other pretrial procedures to narrow the issues. Additionally, we have stated that a party should be granted the relief to which he is entitled under the evidence, regardless of the theory of his pleadings.[33]

Dillingham alleged in its first complaint that McCormick had failed to pay city taxes, fees, and penalties, stating that it would seek payment from McCormick. McCormick therefore had sufficient notice.

Moreover, McCormick waived any objection to the superior court's proceeding to a trial on a piercing the corporate veil theory. Dillingham came to the pre-trial conference intending to prove that McCormick was actually a partner with the Hillbilly Corporation and therefore liable for its debts. The city apparently believed that if it pierced the corporate veil, it could not recover from McCormick personally because he was not a shareholder of the corporation. But the trial court believed that a trial regarding whether Hillbilly's corporate veil should be pierced was the theory most suited to the case:

[The factors established by the Alaska Supreme Court] are the same kind of things that would be considered if there were a claim for piercing the corporate veil. They're the same kind of things that I would consider relevant in determining whether Mr. McCormick, although designated general manager, was acting in some other capacity not as an employee of the corporation.

And those ⸱ . . . will be the kinds of things I'll require the City to prove for the City to prevail. Is there any reason we can't go to trial now that the Court has clarified what it considers the elements of the City's claim?

To this question both counsel replied, "I see no reason, Your Honor." By this reply McCormick waived any objection to the corporate veil theory. If McCormick believed that Dillingham had inappropriately omitted the theory from its complaint, he should have objected at the pre-trial conference.

2. *The superior court did not err in piercing the corporate veil.*

---

**33.** 937 P.2d 297, 307 (Alaska 1997) (footnotes omitted) (quoting *Martin v. Mears*, 602 P.2d 421, 427 (Alaska 1979)); *see Schaible v. Fairbanks* *Med. & Surgical Clinic, Inc.*, 531 P.2d 1252, 1255–56 & n. 16 (Alaska 1975); *Brayton v. City of Anchorage*, 386 P.2d 832, 833 (Alaska 1963).

In *Uchitel Co. v. Telephone Co.*,[34] we announced the standards for determining when those in control of a corporation might be held personally liable:

> (a) whether the shareholder sought to be charged owns all or most of the stock of the corporation; (b) whether the shareholder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (c) whether the corporation has grossly inadequate capital; (d) whether the shareholder uses the property of the corporation as his own; (e) whether the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; (f) whether the formal legal requirements of the corporation are observed.[35]

After hearing the evidence at trial and considering these factors, the superior court decided to pierce the corporate veil and found McCormick personally liable.

■■ McCormick challenges the court's factual findings underlying its consideration of the *Uchitel* factors and its legal conclusion that he is personally liable. We consider his arguments under each of the factors.

### a. *Ownership of stock*

■■ McCormick can be held personally liable despite the fact that he does not own any Hillbilly stock. McCormick's wife, Tatiana, owns all of the company's stock. But when a court considers whether to pierce the corporate veil, it does not simply ask who owns the corporation's stock, but also inquires who controls the company.[36] If other factors militate in favor of piercing the corporate veil, a court may impose personal liability on the control person even if he owns no stock.[37]

### b. *Cause of the incorporation*

The trial court found that McCormick was responsible for the formation of the original corporation, McCormick Construction, as well as its transformation into Hillbilly Enterprises. The record supports this finding. And McCormick even concedes in his brief that he and his wife changed the name of his corporation to Hillbilly Enterprises, making Tatiana McCormick the sole shareholder.

### c. *Inadequate capital*

The trial court focused much of its analysis on the fact that Hillbilly had grossly inadequate capital. The trial court found that not only was Hillbilly undercapitalized, but also that it never had adequate capital.

McCormick challenges the superior court's factual findings, arguing that they were based on incomplete tax records. McCormick's argument is disingenuous; the court sanctioned him for failing to produce the tax returns. Moreover, McCormick does not challenge the superior court's finding that Hillbilly was so inadequately capitalized that it did not have collateral for a loan. Instead, McCormick took personal loans to pay Hillbilly's debts. We cannot conclude that the trial court's finding was clearly erroneous.

### d. *Personal use of corporate property*

In this case, the corporation owned no significant property. Instead, Hillbilly used McCormick's personal construction equipment without any formal leasing arrangement between Hillbilly and McCormick. Hillbilly did, however, pay for the maintenance on the equipment and take the depreciation deduction on its tax return.

McCormick asserts that Hillbilly's lack of assets militates against imposing personal liability. But Hillbilly enjoyed the benefits of the construction equipment and accepted none of the burdens; it was able to use the equipment and take depreciation but did not

---

**34.** 646 P.2d 229 (Alaska 1982).

**35.** *Id.* at 235.

**36.** *See Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C.Cir.1982).

**37.** *See id.; LaFond v. Basham*, 683 P.2d 367, 369 (Colo.App.1984); *Robert's Hawaii Sch. Bus v. Laupahoehoe*, 91 Hawai'i 224, 982 P.2d 853, 872 (1999) ("Therefore, because control is determined by the actual relationship of the parties, formal stock ownership is not dispositive.").

have to make lease payments or subject the equipment to attachment by creditors. We conclude that the ownership structure of Hillbilly's property favors imposing personal liability on McCormick.

### e. *Corporate independence*

Although the superior court did not address this factor directly, it found that McCormick controlled Hillbilly as if he were the sole owner. McCormick offers the following statement, which he made at trial, to argue that this conclusion was clearly erroneous: "It's [my wife, Tatiana's] company. I cannot tell her what to do." In light of the whole record, however, the trial court did not clearly err in concluding that McCormick controlled Hillbilly. McCormick performed most of the work for the company and decided whom to hire and fire. He did not get paid as an employee, but rather he took "draws" whenever he saw fit. He even referred to the money in the corporate checking account as "my money."

### f. *Observance of formal legal requirements*

While it is undisputed that Hillbilly kept some corporate records, it is also clear that the McCormicks used the corporate checking account to conduct non-corporate business. In any event, the superior court put little emphasis on Hillbilly's compliance or lack of compliance with formal legal requirements.

In light of the superior court's factual findings, we conclude that the *Uchitel* factors favor imposing personal liability. We therefore affirm the superior court's decision to impose personal liability.

## V. *CONCLUSION*

We AFFIRM the superior court's grant of summary judgment establishing the validity of the Dillingham business license fee and sales tax. In both instances McCormick failed to overcome the presumption that the actions of a local government are undertaken in compliance with the law. Moreover, we conclude that the superior court's factual findings regarding Hillbilly Enterprise's corporate dealings were not clearly erroneous and that those findings justify imposing personal liability.