# United States Court of Appeals

## For the First Circuit

No. 09-2458

WILLIAM P. MONAHAN,

Plaintiff, Appellant,

v.

WILLARD MITT ROMNEY, ET AL.,

Defendants, Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Chief Judge.
Lipez, Circuit Judge,
and Woodcock,[*] District Judge.

Richard J. Hayes for the appellant.
Robert G. Jones for the appellees.

November 3, 2010

_____

[*]    Of the District of Maine, sitting by designation.

**LYNCH**, **Chief Judge**.  In 2006, William P. Monahan filed suit against former Massachusetts Governor Willard Mitt Romney and several members of the Governor's senior staff: Eric Fehrnstrom, Nicholas Tzitzon, Shawn Feddeman, and Spencer Zwick.  Monahan's complaint listed seven counts revolving around his central allegation that the defendants had unconstitutionally removed him from his office as Chairman of the Massachusetts Civil Service Commission in 2003, depriving him of protected property and liberty interests without due process of law.

After a four-day bench trial in April 2009, the district court found that Monahan had voluntarily resigned and ruled against him on all counts.  Monahan has appealed, arguing that the district court's findings of fact were wholly unsupported by the evidence and that the court therefore committed legal error in its conclusions of law.  We hold that the district court's conclusions are well supported in the evidence and that it committed no error. We affirm entry of judgment for the defendants.

I.

In early 2003, William Monahan filled out an application for membership on the Massachusetts Civil Service Commission.  The background information section on the application included the general question: "Is there any other information or potential conflicts that you feel should be known to us prior to the appointment?"  Monahan answered "No."

-2-

Governor Romney appointed Monahan to be the Chairman of the Civil Service Commission. Monahan began work on August 1, 2003. He was to serve for approximately 4 years and 10 months--the time remaining in the term of the commissioner whom he was replacing. As a public officer, Monahan could only be removed for cause and his interest in continued employment was protected by the Due Process Clause of the Fourteenth Amendment. See Mass. Gen. Laws ch. 7, § 4I; Mass. Gen. Laws ch. 30, § 9; Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 576-78 (1972).

On August 28, 2003, Frank Phillips, a noted investigative reporter from the Boston Globe, called Monahan to ask about his purchase in 1980 of a property at 253 Tremont Street in Boston. Monahan and Dominic Paulo had purchased the property from Gennaro Angiulo, Donato Angiulo, Francesco Angiulo, Michele Angiulo, and Nicolo Angiulo, who were doing business as Huntington Realty. The Angiulo family was deeply connected to organized crime in Boston.[1] Monahan and Paulo had made a down payment of $80,000 on the building, and covered the balance of the purchase price by

---

[1] See, e.g., United States v. Barone, 114 F.3d 1284, 1289 (1st Cir. 1997) ("In the early 1980s, the Patriarca Family was run by boss Raymond Patriarca, Sr., underboss Gennaro 'Gerry' Angiulo, consigliere Vittore Nicolo Angiulo, and capo regimes including Donato F. 'Danny' Angiulo . . . ."); United States v. Angiulo, 897 F.2d 1169, 1175-76 (1st Cir. 1990) (stating that "Gennaro Angiulo, Donato Angiulo, . . . Francesco Angiulo, and Michele Angiulo, are all members or associates of the Patriarca Family of La Cosa Nostra" and that "Gennaro Angiulo was the underboss of this organization, in charge of its day-to-day operations").

executing a promissory note for $180,000 secured by a mortgage with Huntington Realty.

After Phillips confirmed the facts of this transaction with Monahan, he contacted the Governor's Press Secretary, Shawn Feddeman, to inform her that he was working on a story about it. Feddeman conveyed this information to the Governor's Communications Director, Eric Fehrnstrom, and they decided to ask Monahan whether the story was true. The dispute in this case revolves around the content of three ensuing phone calls with Monahan.

At approximately 6:15 p.m., Fehrnstrom and Feddeman--along with Nicholas Tzitzon, the Governor's Director of Appointments--made the first call to Monahan. While it is uncontested that in this call Monahan confirmed that the story was true, there is conflicting testimony about what else was said. Monahan testified that the Governor's staff told him in "very swell and pitched voices" that he needed to resign, to which he responded that the story had been well vetted a dozen years ago, that he had done nothing wrong, and that he thought that the Governor had been aware of the transaction.[2] Fehrnstrom and Feddeman testified that they did not mention resignation during that call, but merely asked

---

[2]    The purchase of the property had been reported in the media in the early 1990s, when Monahan was serving as town selectman in Belmont and running for state representative. Monahan had appeared on a local cable television channel for an hour to discuss the transaction and answer phone calls about it. He testified that he assumed that Romney, who lived in Belmont, knew about the purchase and the media attention that it had received.

Monahan about the transaction and why he had not disclosed it in his job application.

After this call, Fehrnstrom and Spencer Zwick, Romney's Deputy Chief of Staff, contacted Governor Romney. They discussed the nature of the real estate transaction, the prior media attention that it had received, and the pending story to be published in the Boston Globe. Romney told them that he was concerned that Monahan was leading a Commission that acted in a quasi-judicial role, and that Monahan's involvement would severely impact the reputation of the Commission and the reputation of the Commonwealth. Romney decided that Monahan could not be allowed to retain his position, and that he would offer Monahan a chance to resign, and in the alternative, go through the steps to remove him. Romney instructed Zwick to request Monahan's resignation and authorized Zwick to accept a resignation on his behalf.

At 6:52 p.m., Zwick made the second call to Monahan--with Fehrnstrom and Tzitzon also on the line--to request Monahan's resignation. Monahan testified that during this call, Zwick told him that he needed to "take one for the team" and resign, to which he replied that he was a team player and would resign if he thought that it was either in the Governor's or his own best interests, but that it was not in either of their interests. Monahan testified that Zwick provided him with a number for faxing his letter of

resignation, that he wrote down the number, but that he did not commit to resigning.

Monahan's account of this call was contradicted by the testimony of Governor Romney's staff. According to Tzitzon's testimony about the call, Monahan stated that he would in fact resign, Zwick replied that he needed to confirm that Monahan was offering his resignation, and Monahan responded that he was. This account of the call accords with Zwick's testimony that his understanding from the call was that Monahan had offered to resign, and that he had accepted the resignation on Romney's behalf. Fehrnstrom's testimony was also in agreement on this point. Although Fehrnstrom could not "remember the precise words that were used" by Monahan, it was "clear" to him that Monahan had "agreed to voluntarily step down." This was clear because when Fehrnstrom informed Monahan that he was going to notify Phillips at the Boston Globe of the resignation, Monahan "did not object at all" as he "understood that this was the course of action that he had decided upon."

After this call, Zwick informed Governor Romney of Monahan's resignation, and Fehrnstrom informed Feddeman. Feddeman then contacted Phillips at the Boston Globe, explaining that Monahan had resigned and that Romney had accepted his resignation.

At 8:15 p.m., Governor Romney made the third call to Monahan. Romney testified that he began this conversation by

thanking Monahan for tendering his resignation, to which Monahan did not say or indicate in any way that he had not in fact resigned. Romney testified that they talked about the fact that Romney had not been aware of the real estate transaction, that it should have been indicated on Monahan's job application, and that Romney would not have appointed Monahan if he had known about it. Romney testified that he offered to help Monahan find alternative employment, and that when he made this offer, Monahan did not respond by saying that he did not require any help because he had not resigned. Monahan contested this account. Monahan's version was that he told Romney that he did not think that it was in either of their best interests for him to resign, and that therefore he "wasn't going to resign." Monahan testified that Romney merely told him that he should "think it over" and that Romney would help Monahan get a job in the private sector if Monahan resigned.

The next day, August 29, 2003, the Boston Globe published a story on the 1980 transaction and on Monahan's resignation as Chairman of the Massachusetts Civil Service Commission. The parties agree that Monahan went to work that day and found that his garage parking pass no longer worked, and that he worked for part of the day and then went home. At home, he received a phone call from Tzitzon asking why he had not yet faxed his letter of resignation. Monahan testified that he replied that he "wasn't planning to fax any resignation," whereas Tzitzon testified that

Monahan said that he would be happy to send a letter but that he might be delayed because of problems with his printer.

The following day--Saturday, August 30--Joseph Brodigan, a friend of Monahan's and an attorney, informed Zwick that Monahan would not be resigning. When business resumed on the Tuesday after Labor Day, Romney's legal counsel faxed Brodigan a letter stating that it was the administration's position that Monahan had submitted an oral resignation on Thursday, August 28, and that Governor Romney had accepted that resignation. Approximately a week later, Monahan's counsel responded with a position statement stating that Monahan had spent the day after his conversation with Romney thinking about the suggestion that he should resign, that he had decided he must not resign in those circumstances, and that his representative had communicated this decision.

The district court, confronted with conflicting testimony, found "the defendants' version of the facts to be more credible." The court concluded that Monahan voluntarily relinquished his position, that he was not coerced to do so, and that therefore, "the Due Process Clause [was] not implicated since no 'deprivation' of a constitutionally protected interest

occurred."[3]  The court entered judgment for the defendants on all counts.  Monahan filed a timely appeal.

## II.

A district court's findings of fact after trial "must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6); Anderson v. Bessemer City, 470 U.S. 564, 573 (1985).  "A party who challenges a district court's findings of fact, arrived at after a bench trial, faces a steep uphill climb.  When a district court finds the facts without the intervention of a jury, the court of appeals is not at liberty to start afresh."  Fed. Refinance Co. v. Klock, 352 F.3d 16, 26-27 (1st Cir. 2003).  Where there are "two permissible views of the evidence," the "factfinder's choice between those competing views cannot be clearly erroneous."  Id. at 29.  The district court's legal determinations are reviewed de novo.  Am.

---

[3]  The court held, in the alternative, that even assuming Monahan had not voluntarily resigned, "he was afforded all of the process he was constitutionally due.  Monahan's pre-deprivation process--which included an extended conversation with the chief executive officer himself, Governor Romney--and the post-deprivation remedies available to him under Massachusetts law were more than adequate to meet the requirements of the Due Process Clause."  The district court further determined that, even if Monahan was not afforded adequate post-deprivation process, defendants would be entitled to qualified immunity because the claimed "unavailability" or inadequacy of the post-deprivation remedies was not clearly established at the time of the challenged conduct.

<u>Nat'l Fire Ins. Co.</u> v. <u>York County</u>, 575 F.3d 112, 118 (1st Cir. 2009). But this case involves, in the end, no issues of law.

In explaining its finding that Monahan had voluntarily resigned, the district court provided a detailed account of the witness testimony and other evidence presented at trial, and it weighed the evidence in accordance with its responsibility as the trier of fact. The court made express credibility determinations, finding reason to reject Monahan's testimony about aspects of all three phone calls, and gave well reasoned explanations.

As to the first phone call, the court found a tension between Monahan's testimony and the testimony of the defendants. Monahan testified that Romney's staff had pressured him to resign in this first call. However, the court found that at the time of this call, Fehrnstrom and Feddeman had not yet spoken with Governor Romney, and that their focus was on obtaining information, not resignation. The court credited the testimony of Fehrnstrom, and rejected that of Monahan.

As to the second call, the court again rejected key aspects of Monahan's testimony. The court found it "inconceivable that Feddeman would have made [the call to the Globe] had she not been convinced that Monahan had resigned. A dispute about resignation would have turned a 'one day' story into a multiple day story, precisely what the Governor's staff wanted to avoid." There was too great a risk "that Monahan would contest a concocted story

of resignation, giving rise to even more unwanted negative publicity." The court also noted that although Fehrnstrom told Monahan that he was going to report Monahan's resignation to the Globe, Monahan did not state that he needed more time to decide, as one would expect if he had not in fact resigned.

As to the third phone call, which was between Monahan and Governor Romney, the district court credited Romney's testimony, and rejected Monahan's claim that he told Romney in this call that he would not resign. The court's decision was in part based on the fact that Monahan's testimony about the call differed in an important respect from the position statement that he had written shortly after the call. At trial, Monahan testified that he had told Romney on the phone: "[I]f I thought it was in his best interests or mine, I would resign, but I didn't think that it was, and I wasn't going to resign." The position statement stated: "I informed the Governor that if I determined that it was in his best interest and in my best interest, that I would resign. At that point he gave me a private number in order to get in further contact with him." The court found that the absence of the line "I wasn't going to resign" in the position statement was telling, and credited Romney's testimony against that of Monahan.

The district court found that Monahan's resignation was not involuntary. In making this finding, the court cited the fact that Monahan had a choice between resignation and termination; that

-11-

Monahan had a law degree and understood that he was under no obligation to resign and possessed the power to reject the defendants' request; that to the extent any coercion was inherent in the request, it was reduced by the fact that the request was made by phone; and that although Monahan likely felt pressure to make a quick decision, he could have requested more time or demanded to speak to the Governor to argue against resignation. Under these circumstances, the court found, Monahan's resignation was not involuntary.  The district court's reasons were well supported and well explained.  On appeal, no question of law is raised.[4]

Because Monahan voluntarily resigned, his claim that the defendants deprived him of a property interest within the meaning of the Due Process Clause necessarily fails. See Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 173 (4th Cir. 1988) ("If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property

---

[4]    This appeal does not raise the issue of what legal standard should be employed to determine voluntariness.  The parties do not contest the district court's application of the standard set out in Stone v. University of Maryland Medical System Corp., 855 F.2d 167 (4th Cir. 1988), which was cited by this court in Walker v. Waltham Housing Authority, 44 F.3d 1042, 1047 (1st Cir. 1995).  Monahan's argument that the court erred in finding that he voluntarily resigned is based on his claims that the court's underlying factual findings are unsupported.  He argues, for example, that "the trial court's confusion as to factual findings, for which the Court has wide latitude, leads the Court to an erroneous legal finding."

-12-

interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause.").  For the same reason, Monahan's claim that the defendants deprived him of a constitutionally protected liberty interest also fails.  See Lyons v. Sullivan, 602 F.2d 7, 11 (1st Cir. 1979) ("While defamation in the course of termination of governmental employment does entitle an employee to procedural due process protection, . . . the facts alleged do not bring plaintiff within this rule since plaintiff's employment was not terminated; plaintiff resigned.") (citation omitted).

The district court's judgment is affirmed.