OPINION
PER CURIAM.
I. INTRODUCTION
Mary Hill, the owner of an assisted living home, sought damages from Linda Giani, an independent care coordinator; the Department of Health and Social Services (DHSS); and Staci Collier, a state lHeensing specialist; for alleged economic harm caused by a Report of Harm filed by Giani, which resulted in the removal of one of Hill's residents and a subsequent investigation conducted by Collier. The superior court granted summary judgment: to DHSS and Collier on Hill's state law tort claims on the basis of immunity under AS 47.32.160(a); to Collier on Hill's 42 T.S.C. § 1983 due process claim because Hill failed to establish a genuine issue of material fact as to whether Collier's actions deprived her of a constitutional right; and to Giani on the basis of immunity under AS 47.24.120 and common law privilege. Hill appeals. We affirm the court's grants of summary *17 judgment to DHSS and Collier on the basis of immunity under AS 47.32.160(a) and to Collier on Hill's § 1983 claim. Because we find that Hill raised a genuine issue of material fact as to whether Giani acted in good faith when she filed her Report of Harm, we reverse the grant of summary judgment to Giani and remand for further proceedings.
Ciiani cross-appeals the court's grant of attorney's fees under Alaska Civil Rule 82. In light of our reversal of summary judgment, the attorney's fee awarded to Giani is vacated.
II. FACTS AND PROCEEDINGS
A. Facts
Hill owns and operates Wild Rose Gardens Assisted Living Home (Wild Rose), an assisted living home in Palmer licensed for four residents. J.H. moved into Wild Rose in the mid-1990s at the age of 18 and continued to live there until 2005.[1] J.H. has diagnoses of mental retardation, severe psychomotor seizure disorder, Raynaud's Syndrome, B-Tha-lassemia, Oppositional/Defiant Disorder, and symptoms associated with Asperger's Syndrome. Giani became J.H.'s independent care coordinator in 1999. As a State-certified care coordinator paid by the State, Gia-ni's responsibilities included coordinating services between government agencies, providing information to parents, and developing and enforcing plans of care.[2] A team of people assisted with J.H.'s care at Wild Rose, including Larry H., J.H.'s father and legal guardian; Cliani; the Ready Care agency, which coordinated J.H.'s care, paid Giani, and supplied aides to assist Hill during the day; and Hill.
In 2005 Hill told Larry H. that "they should start looking for another placement for J.H." because Hill was unable to provide appropriate care for and was "not making progress with" J.H, According to Larry H., Hill said that J.H.'s behavior was "making it just too difficult for her to handle." Larry H. also testified that Hill was suffering from migraines and could not come to the door at times during his visits to Wild Rose, which he felt was an "additional reason to believe that [Hill] could not take care of [J.H.] properly and [that J.H.] would have to find a new place to live."
On May 12, 2005, Giani submitted a Mental Retardation and Developmental Disability Plan of Care (Plan of Care) for J.H. covering the period of June 1, 2005 to May 81, 2006, which set forth goals and objectives for J.H.'s care and was to be submitted to the State for funding approval. Giani deseribed J.H.'s condition, placement, care providers, and the status of her treatment and care at Wild Rose. Giani noted that over the prior year there had been "increases in oppositional/defiant behaviors, increases in violent behaviors, and regression in all skill areas" which "required a significant increase in verbal and non-verbal cueing, prompts and modeling, physical assistance, and supervision and monitoring [to] meet her needs and insure her health and safety." Giani then stated that "[J.H.'s] team care[s] very deeply about her health, safety, and welfare" and that "[J.H.] loves her home environment and all of her care providers and often expresses that she never wants to leave [Hill's facility]." The Plan of Care also referred to a "Behavior Modification Plan" for J.H., "in which consequences include loss of recreation privileges in the community." Later, in a section titled "Goals and Objectives," Giani noted that J.H. would "receive positive feedback and incentives for appropriate social interactions" and negative feedback "via brief reminders, leaving the room, her 'audience' leaving, or loss of preferred social activities" for inappropriate interactions.
According to Hill, on August 1, 2005, Giani "unexpectedly" informed Hill that Giani was going to move J.H. According to Larry H., although Hill had "changed her mind" about wanting to find a new placement for J.H., he "did not change [his] mind about the need to have [J.H.] move to a new residence"; he was also "concerned that [Hill] would change her mind again and continued to be concerned about [Hill's] headaches and her physical ability to care for [J.H.]." According *18 to Larry H., he found a new place for J.H. to live "[wlith Linda Giant's help," and although he "appreciated Mary Hill's many years of care for [J.H.]," it was his decision to move J.H., and he "believed that decision was in [J.H.'s] best interests."
On August 2, 2005, Giani filed a confidential Report of Harm for the Protection of Vulnerable Adults (Report of Harm) with DHSS pursuant to AS 47.24.010.[3] The Report of Harm described a variety of both repeated and isolated incidents of abusive behavior by Hill towards J.H. that allegedly were observed by Giani and Ready Care staff over the six preceding months, and stated that the "incidents have increased over the past 90 days."
The incidents alleged in the Report of Harm include Hill repeatedly "yelling at [J.H.] and calling her stupid" and "repeatedly telling [J.H.] that she doesn't deserve to live at [Wild Rose]"; confinement of J.H. to her bedroom for most of the 2004-05 winter as a result of perceived bad behavior; denial of visitation to J.H.'s father; forcing J.H. to shower four times within a 30-minute period because she was unable to rinse soap out of her hair; refusing to readmit J.H. after sending her to Alaska Psychiatric Institute (API) and Providence Hospital for psychiatric evaluation; and defensive behavior by J.H-such as covering her face with her hands when asked questions-over the two weeks preceding the Report of Harm. The Report also noted that Hill had notified Giani and Larry H. that she was no longer able to provide J.H.'s care because J.H.'s behavior was "out of control," that Giani had identified a potential new placement and requested Hill's cooperation with a transition, and that Hill had then informed Giani that she "changed her mind and wanted to keep [J.H.]." The Report stated that after Hill decided that J.H. should remain at Wild Rose, Giani, Larry H., and the Ready Care staff noticed a significant change in J.H.'s behavior and believed that she might have been experiencing mental and verbal abuse that had "been occurring over a period of several years." Finally, the Report stated that Giani believed J.H. was not getting the attention, assistance, or proper nutrition she required because Hill's health was declining, and concluded that J.H. should be "removed from the home immediately."
On August 11, 2005, J.H. was removed from Wild Rose.
Giani's Report of Harm triggered an investigation by DHSS, as required by statute.[4] Collier, a state licensing specialist, investigated Giani's Report of Harm by visiting Wild Rose, Ready Care, and J.H.'s new assisted living home, and interviewing Giani, Hill, J.H., Larry H., J.H.'s doctors, and others at Ready Care.
According to Hill, on September 14, 2005, Collier called Hill and told her that she wanted Hill to "show [her] cooperation" with the investigation by faxing a letter to DHSS stating that she would not take any new clients until the investigation was complete. Hill believed that this was a formality, "didn't think [the investigation] would take long," and "wanted to be cooperative," so she submitted a fax stating that she would not take any new residents. Hill admitted in an interrogatory that "during the course of a September 14, 2005 telephone conversation with Staci Collier, [she] agreed to stop taking further clients."
On November 7, 2005, Collier issued a Report of Investigation and Notice of Viola *19 tion, which found that some of Giani's factual allegations were substantiated and others were not. Specifically, the investigation report found that Hill was restricting J.H.'s access to family members, was not following orders for medication administration, had refused to take J.H. back into her residence after sending her to API, and had prevented J.H. from leaving Wild Rose, attending Special Olympics, receiving Christmas presents, and visiting friends as mechanisms of behavior modification. Collier ultimately "found no preponderance of evidence to substantiate [the abuse of resident] allegation under existing Licensing Regulations," but determined that J.H.'s "[rJights were violated" by Hill's restrictions. The Notice of Violation included an Order of Correction, which required Hill to adopt and submit to DHSS a restraint policy for Wild Rose. DHSS also issued a Notice of Administrative Sanction imposing five sanctions: (1) reducing Wild Rose's licensing status to "probationary" until June 30, 2006; (2) reducing Wild Rose's licensing capacity to one through the probationary period; (8) prohibiting Wild Rose from accepting residents requiring 24-hour care through the probationary period; (4) requiring Wild Rose to submit supervision requirements for new residents to DHSS for review and approval during the probationary period; and (5) requiring Wild Rose to pay a $1,200 fine.
On November 18, 2005, Hill filed an administrative appeal in which she contested DHSS's actions and requested a hearing. A hearing was scheduled for February 22, 2006.
On February 10, 2006, the Office of the Attorney General sent a letter to Hill's attorney informing him that DHSS was withdrawing the Notice of Administrative Sanction because a newly adopted senate bill changed the expiration date of Wild Rose's license such that a final decision on Hill's administrative appeal would "most likely not be rendered" until Wild Rose's license was "nearly set to expire." The letter stated that DHSS's decision to withdraw the Notice of Administrative Sanction rendered Hill's administrative appeal moot, and that DHSS had thus filed a Motion to Dismiss. The letter noted, however, that the decision to withdraw the Notice of Administrative Sanetion did not affect the validity of the Notice of Violation and corresponding Report of Investigation, and that Wild Rose was still required to comply with the Order of Correetion. Hill did not oppose the Motion to Dismiss.
B. Proceedings
On August 7, 2007, Hill filed suit against Giani, Collier, and DHSS. Hill's second amended complaint included claims for: (1) negligent supervision against DHSS; (2) intentional interference with contract rights against Collier; (8) intentional interference with prospective economic advantage against Collier; (4) a federal due process violation under 42 U.S.C. $ 1983 against Collier; (5) intentional interference with contract rights against Giani; (6) intentional interference with prospective economic advantage against Giani; (7) defamation against Giani; and (8) intentional and negligent infliction of emotional distress against all defendants.
DHSS and Collier moved for summary judgment on the grounds that Hill's state law tort claims were barred by AS 47.32.160(a), which provides statutory immunity for licensing-related conduct, and that Hill had failed to state the necessary elements of a § 1983 due process claim. Giani moved for summary judgment on the grounds that Giani's actions in assisting Larry H. with J.H.'s move were privileged and that Giani was statutorily immune from suit under AS 47.24.010 with respect to claims based on the confidential Report of Harm.[5] Hill filed oppositions to both motions.
On July 21, 2009, after hearing oral argument, the superior court granted both motions for summary judgment. The court denied Hill's motion for reconsideration.
*20 Hill appeals both grants of summary judgment.
Giani eross-appeals the superior court's award of attorney's fees to her, claiming that the court erred in awarding her Rule 82 rather than Rule 68 fees because she made and beat a $10 offer of judgment given in good faith.
III. STANDARD OF REVIEW
We review grants of summary judgment de novo.[6] In reviewing a grant of summary judgment, we will "determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts." [7] We construe the facts in the light most favorable to the non-moving party and review the trial court's factual findings under the clearly erroneous standard.[8]
The applicability of both state and federal immunity are questions of law that are also subject to de novo review.[9]
IV. DISCUSSION
Hill raises three arguments on appeal: (1) it was error to grant summary judgment to DHSS because DHSS is not immune under AS 47.32.160(a) or, alternatively, because AS 47.32.160(a) does not apply to Hill's negligent supervision claim; (2) it was error to grant summary judgment to Collier because there are genuine issues of material fact as to Hill's 42 U.S.C. § 1988 due process claim; and (8) it was error to grant summary judgment to Giani on the basis of "Immunity/Privilege" because there is a genuine issue of material fact as to whether Giani's Report of Harm was made in "good faith," as required under AS 47.24.120.
A. The Superior Court Properly Granted DHSS And Collier's Motion For Summary Judgment On Hill's State Law Tort Claims Based On Immunity Under AS 47.32.160(a).
Hill argues that the superior court erred in granting summary judgment to DHSS and Collier on Hill's state law claims because the claims are not barred under AS 47.32.160(a).
The superior court concluded that AS 47.32.160(a) provides statutory immunity to DHSS and Collier for all actions involving "implementation of licensing concerns," including removal of J.H. from Wild Rose, the investigation of concerns raised by Giani's Report of Harm, and Collier's request that Hill not take new residents until the investigation was complete, because those actions fell "within the purview of monitoring a licensed entity," which is immune under the statute. We agree.
Alaska Statute 47.32.160(a) states: "The department, its employees, and its agents are not liable for civil damages as a result of an act or omission in the licensure process, [or] the monitoring of a licensed entity...." The plain language of the statute indicates that both DHSS and Collier are immune from all of Hill's state law claims against them because the claims are based on acts taken during the monitoring of a licensed entity.[10]
Hill cites two cases to support her general assertion that DHSS is not immune under AS 47.32.160(a): Native Village of Eklutna v. Alaska Railroad Corp., in which we stated that our "unambiguous summation of the common law of sovereign immunity [is]: 'liability is the rule, immunity the exception, "[11] *21 and Gates v. City of Tenakee Springs, in which we stated that AS 09.65.070(d)(2), which immunized the State for damages resulting from policy decisions, would not immunize a municipality against a suit for damages caused by negligent operational decisions.[12]
Unlike the common law sovereign immunity at issue in Alaska Railroad Corp., the statutory immunity applicable to DHSS and Collier in this case was specifically granted by the Alaska Legislature. Under this circumstance, immunity for the State and its employees while undertaking licensing-related activities is the rule, rather than the exception.[13] Unlike the statute discussed in Gates, which narrowly granted immunity for certain acts,[14] AS 47.32.160(a) explicitly grants broad immunity to the State and its employees for all acts or omissions in the licensure process or monitoring of a licensed entity. Thus, Hill's legal authority does not support her argument that AS 47.32.160(a) does not bar her state law claims against DHSS and Collier.
In the alternative, Hill argues that even if her other state tort claims are barred by AS 47.82.160(2), her negligent supervision claim does not fall under the grant of immunity in AS 47.82.160(a) because-under our holding in B.R. v. State, Department of Corrections[15] -the State negligently breached its duty to protect vulnerable persons whom it undertook to protect, a duty that is separate from its employment relationship with Collier and thus not covered by immunity.
In B.R. we held that the Alaska intentional tort immunity statute did not preclude claims against the State by an inmate who was sexually assaulted by a State employee to the extent that the claims were based on either (1) a breach of the duty to supervise employees other than the intentional tortfeasor employee, or (2) a breach of the State's independent protective duty to prevent assault.[16] We explained that the intentional tort immunity statute did, however, preclude the inmate's negligent supervision claims against the State "to the extent that they merely assert[ed] breaches of the department's duty to exercise due care in hiring, training, and supervising the [intentional tortfeasor] as its employee." [17]
Hill has not alleged that DHSS breached a duty to supervise employees other than Collier. Also, unlike the situation in B.R. where employees other than the intentional tortfea-sor were identified as potentially contributing to the alleged harm,[18] Collier was the only State employee who Hill alleges engaged in wrongful conduct. Thus, Hill's claim is not based on a theory that the State breached a duty to supervise employees other than the intentional tortfeasor, but is merely a claim that the State negligently supervised or trained Collier, a claim which is barred by AS 47.82.160(a).
Hill also asserts that "the [Sltate has a duty to protect the vulnerable persons, at least the ones whom it undertook to protect," suggesting that her negligent supervision claim may be based on a theory that the State breached an independent protective duty that it owed to J.H. Hill cites R.E. v. State, in which we held that the State Division of Family and Youth Services (DFYS) had a duty to exercise reasonable care in carrying out state licensing of daycare facilities because the State created a special relationship between the State and parents when it voluntarily undertook the responsibility of licensing, creating a duty to safeguard day *22 care children from foreseeable harm by daycare providers.[19] We concluded that DFYS was not immune from liability regarding claims by parents that the State was negligent in licensing daycare facilities where their children were sexually abused.[20]
Although RE. might theoretically support a claim by Larry H. that the State had breached a protective duty it owed to him in negligently licensing Hill, it does not support a claim by Hill-a licensee-against the State. Hill does not offer any support for a negligent supervision claim based on a theory that the State breached a separate protective duty it owed to Hill.[21]
Because Hill has neither identified any State employees other than Collier who were involved in the investigation nor explained how the State breached a separate protective duty that it owed to Hill, we affirm the superior court's conclusion that DHSS was immune from liability for Hill's negligent supervision claim under AS 47.82.160(a). Because Collier and DHSS are immune from liability for damages based on actions taken while monitoring Hill, we affirm the superior court's grant of summary judgment to the State and Collier on Hill's state law tort claims.
B. The Superior Court Properly Granted Summary Judgment To Collier On Hill's 42 U.S.C. § 1983 Claim.
Next, Hill argues that the superior court erred in granting summary judgment on her 42 U.S.C. § 1983 [22] federal due process claim against Collier because: (1) "[the deprivation of the right to make a living without due process is [a] deprivation of a constitutionally-protected right"; (2) "[the record does not reflect that Hill was accorded due process"; and (3) there was at least a genuine issue of material fact as to whether Hill voluntarily gave up her right to due process before "being deprived of her constitutionally-protected right to make a living."
Although Hill does have a protected interest in her assisted living home license, we conclude that Hill's federal due process rights were not violated because the temporary and voluntary partial suspension of her license did not constitute a state deprivation of a constitutionally protected right.[23]
To assert a 42 U.S.C. § 1983 claim for violation of federal due process rights, a claimant must show that the conduct complained of was committed by a person acting under color of state law and deprived the claimant of a constitutional right.[24] It is undisputed that Collier was acting under col- or of state law when she requested that Hill voluntarily agree not to take on a new resident while the investigation proceeded. At issue is whether Collier's actions during the investigation deprived Hill of a constitutionally protected right.
*23 1. Hill had a constitutionally protected property interest in her assisted living home license.
In Button v. Haines Borough, we held that commercial tour permit applicants are entitled to due process of law during the permit application process; we cited earlier decisions in which we held that holders of liquor licenses, business licenses, limited entry fishing permits, hunting guide licenses, and driver's licenses have due-process-protected property rights in those permits and licenses.[25] Similarly, in Herscher v. State, Department of Commerce, we held that the appellant's proprietary interest in his hunting guide license was of sufficient importance to warrant due process protection, stating:
It has long been recognized that an interest in a lawful business is a species of property entitled to the protection of due process.... This interest may not be viewed as merely a privilege subject to withdrawal or denial at the whim of the Neither may this interest be dismissed as de minimis. A license to engage in a business enterprise is of considerable value to one who holds it.[26]
In this case, Hill has a protected property interest in her assisted living home license, which, like a guide license, enabled Hill to follow her "chosen pursuit" as a care giver and owner of an assisted living home.[27] As such, she was entitled to due process, or "notice and an opportunity to be heard," prior to being deprived of her assisted living home license.[28]
2. Collier's actions did not deprive Hill of her property interest without due process of law.
A review of the record reveals that all of Collier's actions other than her September 14, 2005 request that Hill cease taking new clients were explicitly required or authorized by AS 47.32.120-150, which de-seribe the required procedures for licensing related investigations, reports, enforcement actions, and hearings.[29] Federal qualified immunity bars a § 1983 action against a government official unless the "contours of the right" allegedly violated are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." [30] Thus, Collier is immune from suit for all of the procedures she followed during the investigation that were required by statute, because no reasonable official would have reason to believe that conduct required or permitted by statute would violate a licensee's federal due process rights.
Hill's federal due process claim therefore turns on whether Collier's request that Hill voluntarily and temporarily refrain from taking additional residents until the investigation was complete constituted a "deprivation" of Hill's property interest in her *24 assisted living home license. We conclude that it did not. Although Hill certainly relinquished a property right, Collier did not actually deprive her of that right. Absent eoercion, voluntarily relinquishing a property interest does not trigger due process protections.
The Tenth Cireuit Court of Appeals reached the same conclusion when presented with a similar issue in McBeth v. Himes.[31] Employees from the Colorado Department of Human Services (DHS) pressured McBeth to relinquish her daycare license after her son, who lived with her, was charged with sexual abuse of a child.[32] The DHS employees informed her that if she voluntarily relinquished her license, it would be easier for her to have it reinstated later.[33] McBeth relinquished her lHcense but later claimed that the DHS employees violated her due process rights by coercing her into relinquishing her daycare license without notice of any violations and an opportunity to be heard.[34] The Tenth Cireuit disagreed, holding that "if one voluntarily relinquishes some property or liberty interest, then she cannot have a claim for a due process violation because no state official deprived her of that interest." [35] McBeth argued that her surrender was not voluntary but "coerced" by the DHS employees' threat to suspend her license.[36] The Tenth Cireuit rejected this argument, reasoning that DHS employees provided McBeth with two alternatives: she could voluntarily relinquish her license and avoid having the incident marked on her permanent record, which could impair her ability to reapply for a license, or she could proceed with the administrative suspension proceedings.[37] McBeth could not later claim "that she did not receive adequate process when she chose to forgo the process that she would have been afforded in a suspension proceeding." [38]
Similarly, Hill argues that her agreement to stop taking residents was not voluntary. But Hill produced no admissible evidence to support this argument. The evidence before us indicates that Hill voluntarily agreed to stop taking residents until the investigation was complete,[39] and unsupported arguments in pleadings do not raise genuine issues of material fact.[40] Because Hill voluntarily agreed to refrain from taking new residents until the investigation was complete, she has failed to raise a genuine issue of material fact showing that Collier deprived her of her property interest. Accordingly, we affirm the superior court's grant of summary judgment to Collier on Hill's § 1983 federal due process claim.
*25 C. It Was Error To Grant Summary Judgment To Giani Based On Immunity Under AS 47.24.120.
The superior court concluded that Giani was immune from liability under AS 47.24.120 for any harm caused by the quick removal of J.H. from Wild Rose, and ruled that summary judgment was proper because Hill had not met her burden of presenting evidence that raised a genuine issue of material fact as to whether Giani acted in good faith when she filed her Report of Harm.
Hill argues that the superior court erred in granting summary judgment to Gia-ni on the basis of immunity under AS 47,24,120 because she raised a genuine issue of material fact as to whether Giani acted in good faith. We agree.
Alaska Statute 47.24.120(a) states: "A person who in good faith makes a report under AS 47.24.010, regardless of whether the person is required to do so, is immune from civil or criminal liability that might otherwise be incurred or imposed for making the report." The parties agree that Giani was a mandatory reporter under AS 47.24.010(a) and thus had qualified immunity for claims based on harm caused by Giani's Report of Harm under AS 47.24.120(a) so long as the report was made in good faith.[41]
Although we have not addressed AS 47.24.120(a) previously, we have developed standards for determining whether summary judgment should be granted to a party whose actions are protected by qualified official immunity, provided that the party acted in "good faith." [42] In such cases, when qualified official immunity is raised as grounds for summary judgment, the nonmov-ing party must present some admissible evidence that creates a genuine issue of material fact regarding whether the official acted in good faith.[43] 'We will consider affidavits, depositions, admissions, answers to interrogatories, and similar materials, but unsubstantiated allegations in the complaint or opposition alone are insufficient to create a genuine issue of material fact regarding state of mind.[44]
In Smith v. Stafford, we reviewed a grant of summary judgment based on qualified official immunity and held that Smith's sworn affidavit-which stated that a state social worker had staged photographs of garbage and beer cans around Smith's home to create false evidence implying he had an alcohol problem, and that the social worker had threatened that Smith would never see his child again if he complained about or questioned the official's authority-was sufficient to create a genuine issue of material fact about the official's state of mind because "[the statements in the affidavit, if true, indicate that [the social worker] may have been acting in bad faith." [45] Although we recognized the evidence supporting Smith's claim of bad faith was "seant" and his assertions "may be unsubstantiated by other evidence," these assertions were sufficient to create a genuine issue of fact because they were "made in an affidavit of a 'duly sworn' witness, and they correspond to allegations made in [the complaint]." [46] In short, Smith presented "some admissible evidence" that the social worker acted "maliciously, corruptly, or in bad faith," and therefore, summary judgment was improper.[47]
Turning to the statutes at issue here, the primary goal behind AS 47.24.010 is to protect vulnerable individuals, and the purpose of AS 47.24.120(a) is to encourage those who are required to report to do so without fear that their reports will subject them to liability. Because AS 47.24.010 explicitly requires certain individuals to report any behavior that gives them "reasonable cause to believe that a vulnerable adult suf *26 fers from abandonment, exploitation, abuse, neglect, or self-neglect," it is not enough to show that the reporter acted negligently. Instead, establishing a genuine issue of material fact as to whether a mandatory reporter acted in good faith requires a litigant to present admissible evidence indicating the reporter acted maliciously, corruptly, or in bad faith.[48] If the report is filed with a good faith belief that a vulnerable adult may have suffered harm, the reporter will be shielded from liability by AS 47.24.120(a) even if the reported belief is ultimately unsubstantiated. Evidence indicating the reporter filed the report of harm with a malicious or corrupt purpose or with the belief that no harm had actually occurred, however, is sufficient to raise a genuine issue of material fact as to whether the reporter acted in good faith. Thus, the relevant inquiry for determining whether admissible evidence creates a genuine issue of material fact whether a reporter acted in good faith is not whether the evidence shows that the alleged harm actually occurred, but whether the evidence shows that the reporter did not have a good faith belief that the alleged harm occurred.
Here, Hill bears the burden as the non-moving party of establishing a genuine issue of material fact regarding whether Giani act, ed in bad faith.[49] Hill met that burden.
At the outset, it is important to recall that as a mandatory reporter, Giani was required to report to the State whenever she had reasonable cause to believe Hill was physically or emotionally abusing J.H.[50] The only report of harm in the record is the August 2005 Report; the reasonable inference in favor of Hill is that at no time prior to August 2005 did Giani have reasonable cause to believe Hill was physically or emotionally abusing J.H-otherwise her failure to report would have been a violation of law and subject to misdemeanor charges.[51]
With respect to what Giani was doing, what she knew, and what she said about Hill prior to the August 2005 Report, the May 2005 Plan of Care is particularly relevant. The reasonable inference in favor of Hill is that Giani would be truthful in her Plan of Care that was to be submitted to the State, and that as a care coordinator Giani would make known any concerns she had about J.H.'s placement with Hill and about any failure by Hill to follow through with the care plan. In this light, it is significant that Gia-ni's Plan of Care does not include any allegations of abuse; on the contrary, the Plan speaks highly of J.H.'s care at Hill's facility. This positive account is generally in tension with the negative portrayal of Hill in the Report of Harm submitted several months later. More important, the Plan of Care is apparently inconsistent with the allegations included in the Report of Harm on each of the following points.
First, the Report of Harm states that Hill yelled at J.H., called her stupid, and told her she didn't deserve to live in Hill's facility. The Report also states that J.H. "may be experiencing verbal and mental abuse [that] may have been occurring over a period of several years." At her deposition, Gani stated that Hill had been making the "didn't deserve" comment "almost ever since I began working with [J.H.] in 1999." Giani further stated that she had documented the yelling and "stupid" comments over a six-month period before the Report of Harm, and she had witnessed similar incidents over a period of at least a year before the Report of Harm. The Plan of Care, however, does not mention any such abuse, nor had Giani previously reported this allegedly longterm problem.
Second, Giani's Report of Harm suggests that Hill wrongfully deprived J.H. of certain "privileges," such as participation in recreational activities. Yet the Plan of Care specifically sets out a behavior modification plan Hill was supposed to follow, calling for both positive reinforcement for good behavior and loss of privileges for bad behavior. Moreover, Hill testified at her deposition as to how the loss of privileges worked, and her *27 testimony is consistent with the May 2005 Plan.
Third, Giani's Report refers to an incident in which J.H. became overly aggressive to an attendant; Hill sought to have J.H. admitted to API and then refused to allow her to return for 72 hours. Giani's Report links the incident to poor implementation of the Behavior Modification Plan. At her deposition, Giani stated that her concern over this incident was primarily the 72-hour issue-she asserted this was a licensing violation that had to be reported or she would face misdemeanor charges. Yet this same incident is described in the Plan of Care as evidence of J.H.'s increased aggressive behavior. Further, if, as Giani asserted, she included this alleged licensing violation in the August 2005 Report of Harm because she was required to do so, it is unclear why she did not report the incident when she learned of it earlier that year. In sum, drawing reasonable inferences in favor of Hill from these apparent inconsistencies between Giant's Plan of Care and her Report of Harm, it could be concluded that Giani did not subjectively believe her statements in the Report of Harm.
In addition to these apparent inconsisten-cles between the Plan and the Report, Hill provided other evidence that, viewed in the light most favorable to Hill, further supports the conclusion that there are genuine issues of material fact regarding Giant's good faith. In the summary judgment proceedings, Hill submitted the affidavit of an 11-year employee familiar with J.H. who stated that she had never observed Hill abuse J.H. or "conduct{ ] herself inappropriately in any fashion as respects J.H.'s care." Moreover, Hill's employee specifically denied statements Giani had attributed to her in the Report of Harm and further denied other allegations by Giani. Hill also submitted letters from doctors and other individuals describing Hill in complimentary terms completely contrary to Giani's description; although hearsay, there did not appear to be an evidentiary objection by Giani. Hill also provided sworn discovery responses that dispute the Report of Harm's assessment of J.H.'s allegedly defensive behaviors in the weeks preceding the Report, explaining that such behaviors were typical for J.H. and were not indicative of abuse.
Giani's Report of Harm is also inconsistent with Hill's deposition testimony that when Giani arrived to remove J.H., Giani and J.H.'s father hugged and comforted Hill and told Hill that "they knew [Hill] had not abused [J.H.]." Taking Hill's evidence as true and drawing all reasonable inferences in favor of Hill, Hill's evidence further supports the conclusion that Giani did not subjectively believe her statements in the Report of Harm.
Finally, in Hill's deposition testimony she stated that Giani "repeatedly threatened" that she would "make things very ugly" for Hill if Hill did not give up any objections to J.H.'s removal from Hill's facility. Taking this testimony as true for purposes of summary judgment, this may show a motive on Giani's part to override Hill's decision to continue with J.H.'s placement and to quickly remove J.H. from Hill's facility; this is further supported by the fact that Giani submitted the Report and helped to conduct the hurried move of J.H. out of Hill's facility when Giani believed Hill was away on vacation. Giani may have believed she was acting in J.H.'s best interests for placement when she made the Report, but knowingly making untrue statements in a Report of Harm is not protected by a good motive. At the summary judgment stage, to defeat a motion for summary judgment it is sufficient to present evidence raising a genuine issue of material fact that Giani knowingly made untrue statements in her Report of Harm.
Giani argues that "the DHSS investigation finding[ ] that Giani's reports were at least partially substantiated, in itself, demonstrates the good faith of Giant's actions." In fact, the investigation concluded that the most serious allegation against Hill, abuse of a resident, was unsubstantiated. Moreover, when Hill requested a hearing to contest the sanctions issued by DHSS,[52] the State withdrew its Notice of Administrative Sanction, *28 mooting Hill's appeal. In any event, the DHSS investigation ultimately has little relevance to the issue of Giani's good faith; the DHSS report of investigation did not reach any conclusions concerning Giani's good faith and the results of the investigation cannot by themselves "demonstrate" her good faith.
In summary, viewing the evidence in the light most favorable to Hill,[53] there is admissible evidence that, if proven, could show Giani did not believe Hill had abused J.H. and filed the Report of Harm in bad faith. Hill's submission in opposing Giani's motion for summary judgment included deposition testimony, sworn discovery responses, an employee affidavit, numerous character reference letters (hearsay but not objected to by Giani in her reply), the May 2005 Plan of Care, and the August 2005 Report of Harm. As detailed above, this evidence created an issue of fact on whether Giani could honestly have believed the allegations in the Report of Harm. We therefore hold that it was error to grant summary judgment to Giani based on qualified immunity.[54]
D. The Attorney's Fees Award Is Vacated.
Giani eross-appeals the superior court's award of Rule 82 attorney's fees to Giani, arguing that the court erred in granting Rule 82 attorney's fees rather than attorney's fees under Rule 68. In light of the fact that we reverse the superior court's grant of summary judgment and remand for further proceedings, we vacate the award of attorney's fees to Giani.
v. CONCLUSION
We AFFIRM the superior court's grants of summary judgment to Collier and the State, REVERSE the superior court's grant of summary judgment to Giani, VACATE the court's award of attorney's fees to Giani, and REMAND for further proceedings.
CHRISTEN, Justice, not participating.

. We use initials to protect J.H.'s privacy.

. See 7 Alaska Administrative Code 130.319(1) (2013).

. AS 47.24.010(a) requires that care coordinators "who, in the performance of their professional duties, have reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect ... report the belief to the department's central information and referral service for vulnerable adults."

. AS 47.24.015(a) states:
Upon the department's receipt of a report under AS 47.24.010 that is not transferred under AS 47.24.013, the department, or its designee, shall promptly initiate an investigation to determine whether the vulnerable adult who is the subject of the report suffers from undue influence, abandonment, exploitation, abuse, neglect, or self-neglect. The department, or its designee, shall conduct a face-to-face interview with the subject of the report unless that person is unconscious or the department, or its designee, has determined that a face-to-face interview could further endanger the vulnerable adult.

. Alaska Statute 47.24.010, the statute Giani relied on, requires certain individuals such as physicians and guardians to report to DHSS whenever they have "reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect...." Alaska Statute 47.24.120 provides that a person who makes such a report in good faith is immune from civil or criminal liability.

. Yost v. State, Div. of Corps., Bus. & Prof'l Licensing, 234 P.3d 1264, 1272 (Alaska 2010).

. Wright v. State, 824 P.2d 718, 720 (Alaska 1992).

. McCormick v. City of Dillingham, 16 P.3d 735, 738 (Alaska 2001).

. See Lawson v. Helmer, 77 P.3d 724, 726 (Alaska 2003) (de novo review for state immunity); Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1106 (Oth Cir.2001) (de novo review for federal immunity).

. Cf. J & L Diversified Enter., Inc. v. Municipality of Anchorage, 736 P.2d 349, 351-52 (Alaska 1987) (holding that plain language of state statute, which stated that no action for damages could be brought against a municipality or any of its agents, officers, or employees if the claim is based on licensing, precluded action for damages against the Municipality of Anchorage).

. 87 P.3d 41, 49 (Alaska 2004).

. 822 P.2d 455, 458-59 (Alaska 1991).

. Cf. Native Vill. of Eklutna, 87 P.3d at 49:
The presumption of immunity the Railroad seeks is a form of the State's sovereign immunity. When a party invokes a background rule granting it immunity, stated by neither the courts nor the legislature of Alaska, it would do well to confront how to square that rule with this court's unambiguous summation of the common law of sovereign immunity: 'liability is the rule, immunity the exception.' ... And by abolishing the State's common law immunity to suits sounding in contract, quasi-contract, or tort, the legislature has shown complementary disfavor for sovereign immunity
(cita.tions omitted).

. 822 P.2d at 459.

. 144 P.3d 431, 437 (Alaska 2006).

. Id.

. Id. at 435.

. Id. at 437.

. 878 P.2d 1341, 1347-48 (Alaska 1994).

. Id. at 1349.

. We do not need to address whether Hill has third-party standing to bring an action against the State under RE. for breach of a protective duty it owed to J.H. because Hill admits in her Reply Brief that she "does not claim to be asserting any of J.H.'s rights-only her own."

%. Title 42 U.S.C. § 1983 (1996) provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

. The superior court found that Hill had not identified a legally protected interest. We conclude that Hill's interest in maintaining her assisted living care license is a protected property interest, but because we find that Collier's request that Hill not take any new residents did not constitute a deprivation, the superior court's finding that Hill had not identified a legally protected interest was harmless error. We must disregard harmless errors that have no substantial effect on the rights of the parties or on the outcome of the case. See, eg., Fairbanks N. Star Borough v. Rogers & Babler, 747 P.2d 528, 531 (Alaska 1987) ("'Even if a finding of fact or conclusion of law is erroneous, the mistake is not grounds for reversal if the finding or conclusion i~ not necessary to the court's ultimate decision.").

. Okpik v. City of Barrow, 230 P.3d 672, 677 (Alaska 2010).

. 208 P.3d 194, 207 (Alaska 2009) (citing Ro-lins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd., 991 P.2d 202, 211 (Alaska 1999)) (holding that liquor license renewal applicant had protected property right); Hilbers v. Municipality of Anchorage, 611 P.2d 31, 36 (Alaska 1980) (holding that initial issuance of business license is protected); Bartlett v. State Commercial Fisheries Entry Comm'n, 948 P.2d 987, 990 (Alaska 1997) ("An individual's interest in an application for a limited entry fishing permit is entitled to due process."); Javed v. Dep't of Pub. Safety, 921 P.2d 620, 622 (Alaska 1996) ("A driver's license represents an important property interest which is protected under the due process clause of the Alaska Constitution.").

. 568 P.2d 996, 1002 (Alaska 1977).

. Id. at 1003.

. See id. at 1002 ("Due process of law requires that before property rights can be taken directly or infringed upon by governmental action, there must be notice and opportunity to be heard." (citing Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970))).

. Hill received a copy of Collier's report and Notice of Violation within ten working days after the investigation was complete, as required by AS 47.32.120(a). The State was authorized by AS 47.32.130 to immediately suspend Hill's license without an administrative hearing and Hill received notice that her license was suspended as required by AS 47.32.130(b)(2). Hill was given an opportunity to cure the violations within a reasonable time as required by AS 47.32.140(a). And Hill took advantage of her right to request a hearing under AS 47.32.150.

. Smith v. Stafford, 189 P.3d 1065, 1076 (Alaska 2008) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

. 598 F.3d 708 (10th Cir.2010).

. Id. at 712.

. Id. at 713.

. Id. at 723.

. Id. See also Monahan v. Romney, 625 F.3d 42, 47 (1st Cir.2010) ("'Because Monahan voluntarlly resigned, his claim that the defendants deprived him of a property interest within the meaning of the Due Process Clause necessarily fails."); Yearous v. Niobrara Cnty. Mem. Hosp., 128 F.3d 1351, 1356 (10th Cir.1997) ("If Plaintiffs resigned of their own free will, even as a result of Defendant's actions, then they voluntarily relinquished their property interests and, thus, Defendant did not deprive them of property without due process of law."); Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 173 (4th Cir.1988) ("If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause.").

. McBeth, 598 F.3d at 723.

. Id. at 723-24.

. Id. at 724.

. Although Hill contends that there is at least a genuine issue of material fact as to whether she voluntarily gave up her right to due process, Hill admitted in an interrogatory that she agreed to Collier's request, she stated in her deposition that she "wanted to be cooperative and so [she] did as [Collier] said and sent the fax saying [she] wouldn't take any new clients," and on September 14, 2005, she submitted a handwritten note stating that she would not receive any new clients.

. See Fenner v. Municipality of Anchorage, 53 P.3d 573, 578 n. 25 (Alaska 2002) (quoting Christensen v. NCH Corp., 956 P.2d 468, 474 (Alaska 1998)) (stating mere assertions of fact in pleadings are insufficient to raise a genuine issue of material fact).

. Under AS 47.24.010(a), Giani is required to file a report to the DHSS if she has "reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect."

. See, eg., Smith v. Stafford, 189 P.3d 1065 (Alaska 2008).

. See id. at 1074.

. Id. at 1072-74.

. Id. at 1068, 1074-75.

, Id. at 1074.

. Id. at 1074-75.

. Id. at 1075.

. Id. at 1074.

. See AS 47.24.010(a).

. See AS 47.24.010(c).

. See former AS 47.33.550(d) (2004) (providing that "(aln assisted living home may contest a licensing agency's decision to impose an administrative sanction by filing a written request for a hearing ... no later than 10 days after receipt of the notice of administrative sanction").

. McCormick v. City of Dillingham, 16 P.3d 735, 738 (Alaska 2001) ("When considering whether the moving party is entitled to summary judgment, we construe the facts in the light most favorable to the non-moving party... .").

. In reaching this conclusion, we nevertheless sympathize with the dissent's point that a mandatory reporter such as Giani may be put in a difficult position when it is unclear whether there is a reasonable basis to believe there is abuse of an adult, especially when the State requires that a report should be made even if the reporter is in doubt about the abuse. On this matter, however, we must defer to the legislature, which created the standard of reporting, the mandatory nature of reporting for some individuals, and the standard for qualified immunity.